1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9    ARIZONA CONTRACTORS                )    No. CV07-1355-PHX-NVW (lead)
     ASSOCIATION, INC., an Arizona non-  )    No. CV07-1684-PHX-NVW (member)
10   profit corporation; ARIZONA        )
     EMPLOYERS FOR IMMIGRATION          )    **FINDINGS OF FACT, CONCLUSIONS**
11   REFORM, INC., an Arizona non-profit )    **OF LAW, AND ORDER**
     corporation; CHAMBER OF            )
12   COMMERCE OF THE UNITED             )
     STATES OF AMERICA, a Washington    )
13   D.C. non-profit corporation; ARIZONA )
     CHAMBER OF COMMERCE, an            )
14   Arizona non-profit corporation;    )
     ARIZONA HISPANIC CHAMBER OF        )
15   COMMERCE, INC., an Arizona non-    )
     profit corporation; ARIZONA FARM   )
16   BUREAU FEDERATION, an Arizona      )
     non-profit corporation; ARIZONA    )
17   RESTAURANT AND HOSPITALITY         )
     ASSOCIATION, an Arizona non-profit )
18   corporation; ASSOCIATED MINORITY   )
     CONTRACTORS OF AMERICA, an         )
19   Arizona non-profit limited liability )
     company; ARIZONA ROOFING          )
20   CONTRACTORS ASSOCIATION, an        )
     Arizona non-profit corporation;    )
21   NATIONAL ROOFING                   )
     CONTRACTORS' ASSOCIATION, an       )
22   Illinois not-for-profit corporation; )
     WAKE UP ARIZONA! INC., an          )
23   Arizona non-profit corporation; and )
     ARIZONA LANDSCAPE                  )
24   CONTRACTORS ASSOCIATION,           )
     INC., an Arizona non-profit corporation, )
25                                       )
                    Plaintiffs,          )
26                                       )
     vs.                                 )
27                                       )

28

1  JANET NAPOLITANO, Governor of          )
   the State of Arizona; TERRY            )
2  GODDARD, Attorney General of the       )
   State of Arizona,                      )
3                                         )
            Defendants.                   )
4  _____)
   CHICANOS POR LA CAUSA, INC.;           )
5  and SOMOS AMERICA,                     )
                                          )
6            Plaintiffs,                  )
                                          )
7  vs.                                    )
                                          )
8                                         )
   JANET NAPOLITANO, in her official      )
9  capacity as Governor of the State of   )
   Arizona; TERRY GODDARD, in his         )
10 official capacity as Attorney General of )
   the State of Arizona; and GALE         )
11 GARRIOTT, in his official capacity as  )
   the Director of the Arizona Department )
12 of Revenue,                            )
                                          )
13           Defendants.                  )
   _____)
14

15         Plaintiffs challenge the Legal Arizona Workers Act, A.R.S. §§ 23-211 through

16 214, enacted July 2, 2007, and effective January 1, 2008.  2007 Ariz. Sess. Laws, Ch.

17 279.  The Act provides the superior courts of Arizona with the power to suspend or

18 revoke the business licenses of employers who intentionally or knowingly employ an

19 unauthorized alien.  By agreement of the parties, the two cases were consolidated and

20 accelerated for trial on November 14, 2007, on stipulated facts and written evidence.

21 Defendants' motions to dismiss were deferred to the trial.  This order states findings of

22 fact and conclusions of law pursuant to Rule 52(a), Fed. R. Civ. P.

23         There is no justiciable case or controversy against these Defendants.  Plaintiffs do

24 not intentionally or knowingly employ any unauthorized aliens, and they have no plans

25 to.  They bear no immanent threat of enforcement.  Only county attorneys are authorized

26 to enforce the Act.  These Defendants—the Governor, the Attorney General, and the

27 Director of the Department of Revenue—have only investigatory or informational

28 authority under the Act, and they have not made even empty threats to prosecute anyone.

1    Verifying the employment eligibility of new hires through the federal E-Verify
2    program has some costs for employers.  The federal government makes E-Verify
3    available, but the State mandates its use.  Although the State's mandate to use E-Verify
4    has no direct enforcement or enforcer, the Act indirectly forces employers to obtain
5    powerful evidence of workers' authorization from the federal government.  The plausible
6    consequence for refusing to use E-Verify may be that employers also cannot prove their
7    good faith compliance with the I-9 process because the E-Verify system would have
8    exposed the employee's lack of authorization.  An employer who foregoes the mandated
9    E-Verify evidence may be left with little or no evidence that matters.  For this reason,
10   participation in E-Verify is not a free choice even though there is only a general threat of
11   enforcement proceedings, and even though Plaintiffs' failure to participate in E-Verify
12   does not increase appreciably the likelihood of enforcement proceedings against them.
13   The Act forces them to enroll in E-Verify because if they do not enroll now they face near
14   certain and intolerable harm in the event of a future enforcement proceeding.

15   Yet the court cannot redress that internal coercion with a judgment against these
16   Defendants.  The State officers do not cause the intolerable risk that Plaintiffs may have
17   no defense if they forego the E-Verify evidence.  That risk finds its sting only at the hands
18   of a county attorney, the only official empowered to bring a future enforcement
19   proceeding.

20   This action must be dismissed without prejudice for lack of subject matter
21   jurisdiction, there being no justiciable case or controversy against the Defendants.

22   **I.    Employer Sanctions in the Federal Government's Immigration Reform and
         Control Act and E-Verify**
23

24   **A.    Summary of the IRCA**

25   Federal law first created sanctions for employers of unauthorized aliens in the
26   Immigration Reform and Control Act (IRCA), enacted in 1986.  Before then, federal law
27   did not displace State authority to enact and enforce sanctions against employers of
28   unauthorized aliens except to the extent the State law conflicted with federal enactments.

1   *De Canas v. Bica*, 424 U.S. 352 (1976).  The central provisions of IRCA are codified at 8

2   U.S.C. §§ 1324a through 1324c.  With certain exclusions, it is unlawful to hire or

3   continue to employ a person known to be an unauthorized alien.  8 U.S.C. §

4   1324a(a)(1)(A) and (a)(2).  An unauthorized alien is one who is not "either (a) an alien

5   lawfully admitted for permanent residence, or (B) authorized to be so employed by this

6   Act [IRCA] or by the Attorney General."  § 1324a(h)(3).

7       The IRCA also requires employees and employers to comply with a paper-based

8   employment eligibility verification system set out in 8 U.S.C. § 1324a(b), known as the I-

9   9 system.  Employees must swear to their authority to work, and employers must examine

10   certain wide classes of identification documents recorded on Form I-9.  An identification

11   document is sufficient if it "reasonably appears on its face to be genuine."  §

12   1324a(b)(1)(A).  Employers must keep records of compliance with the I-9 system.  §

13   1324a(b)(1)(3).  An employer's good faith attempt to comply suffices notwithstanding a

14   technical or procedural failure unless the employer has engaged in a pattern or practice of

15   violations or fails to correct an error after the government points it out.  § 1324a(b)(6).

16       The IRCA entrusts its enforcement to the Attorney General with hearings before

17   specially selected administrative law judges, subject to federal judicial review.  §

18   1324a(e).  The government must prove by a preponderance of the evidence that the

19   employer knowingly hired or retained an unauthorized alien, but it is "an affirmative

20   defense" that the employer "complied in good faith" with the I-9 system mandated by §

21   1324a(b). § 1324a(a)(3) and (e)(3)(C).  Remedies include cease and desist orders and

22   civil fines from $250 to $2,000 for a first order, $2,000 to $5,000 for a second order, and

23   $3,000 to $10,000 for a further order.  Other remedial action may be ordered.  §

24   1324a(e)(4).  The Attorney General may seek enforcement of orders in a federal district

25   court.  § 1324a(e)(9).  For a pattern or practice of violations a criminal fine up to $3,000

26   and imprisonment up to six months can be imposed.  The Attorney General may also seek

27   civil injunctive relief.  § 1324a(f).

28       Central to Plaintiffs' challenges in this case is the preemption clause of 8 U.S.C.§

1324a(h)(2), which provides, "The provisions of this section [28 U.S.C. § 1324a] preempt any State or local law imposing civil or criminal sanctions (other than through licensing or similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."

Other sections prohibit document fraud and employment discrimination based on national origin or legal immigration status, with enforcement procedures, tribunals, and remedies.  8 U.S.C. § 1324b and 1324c.  There are other provisions that need not be reviewed to understand the justiciability issues in this case.

### B.   Failure of the I-9 System

As the Congressional Research Service Report to Congress dated April 20, 2007, concludes, "There is general agreement that the I-9 process has been undermined by fraud — both *document fraud*, in which employees present counterfeit or invalid documents, and *identity fraud*, in which employees present valid documents issued to other individuals."  (Joint Statement of Facts, Doc. # 72 (Facts), Ex. 15 at 3.)  The result of the failure of the I-9 system and other causes is that "an estimated 7.2 million unauthorized workers were in the U.S. civilian labor force in March 2005, representing about 5% of the labor force."  (*Id.* at 1.)  The unauthorized resident alien population "has grown at an average annual rate of more than 500,000 per year."  (*Id.*)  As the director of immigration policy for Plaintiff U.S. Chamber of Commerce testified before Congress last June, "Current immigration laws are severely flawed and have failed to curb the flow of undocumented workers into the U.S."  (Facts, Ex 22J at 3.)

### C.   E-Verify

Building on the I-9 system, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, §§ 401–404, 110 Stat. 3009, 3009-655 to 3009-666, directed the Attorney General to conduct three pilot programs for employment eligibility confirmation, one of which is still in operation, formerly known as the Basic Pilot and now known as E-Verify.  (Facts, Ex. 8 at 1.)  Originally limited to five states, it was expanded nationwide in 2004.  Federal law does not mandate E-Verify

1   participation except for some government contractors and violators of immigration laws.

2   (Facts, Ex. 9 at 1.)  E-Verify is an Internet-based system that electronically compares

3   information submitted by the employee on Form I-9 with the records maintained by the

4   Social Security Administration (SSA) and the Department of Homeland Security (DHS).

5   Employers participating in E-Verify sign a Memorandum of Understanding

6   (MOU) with SSA and DHS that sets out terms of use.  (Facts, Ex. 7.)  After hiring a new

7   employee the employer queries E-Verify, which then compares the information to SSA's

8   primary database.  If the information matches, the employer is immediately notified that

9   the employee is verified.  If the submitted information is inconsistent with SSA data, the

10  employer is notified of a tentative nonconfirmation within three federal work days, but

11  usually immediately. (Facts, Ex. 7, Art. II § A ¶ 4; Ex. 11 at 2.)

12  If the submitted information and SSA data are consistent for noncitizens but the

13  SSA database does not permit confirmation of work-authorization, the submitted

14  information is next compared to the DHS's data, usually at the U.S. Citizenship and

15  Immigration Services (CIS).  If the CIS automated match is adequate to establish work-

16  authorization, the employee is verified immediately.  If not, a CIS field office records

17  expert checks other DHS information.  If the field worker is able to verify work-

18  authorization, the employer is typically notified within one day of case submission.

19  (Facts, Ex. 11 at 2.)

20  When neither the automated SSA and DHS checks nor the check by the

21  immigration status verifier can confirm an employee's work status, the system issues the

22  employer a tentative nonconfirmation.  The employer must notify the employee, who has

23  eight days to contest the finding by contacting SSA or CIS to resolve any inaccuracies in

24  their records.  (Facts, Ex. 13, App. C at C-2.)  The MOU gives detailed steps to assist the

25  employee in contesting a tentative nonconfirmation.  (Facts, Ex. 7, Art. III § B.)  The

26  contesting process is normally limited to ten federal work days, but may be extended.  No

27  adverse action may be taken against the employee in the meantime.  Employees who do

28  not contest the tentative nonconfirmation receive a final nonconfirmation finding.  If

1  contested, CIS informs the employer of the employee's final work-authorization status.

2  After ten days, employers must either immediately terminate employment or notify DHS

3  of the continued employment of workers who have not successfully contested the

4  tentative nonconfirmation and who E-Verify has found not to be work-authorized. (Facts

5  Ex. 7, Art. II § C ¶ 6; Ex. 10 at 7; Ex. 11 at 2–3.)

6      About 92% of queries confirm work authorization within seconds.  About 7%

7  cannot be confirmed immediately by SSA, and about 1% cannot be confirmed

8  immediately by DHS.  Resolving the nonconfirmations can take several days, or in a few

9  cases even weeks.  (Facts, Ex. 22B at 3.)

10     Other provisions are aimed at protecting privacy and preventing misuse of the E-

11  Verify system.  Participating employers must verify all new hires, but only new hires.

12  The employer agrees in the MOU to grant SSA and DHS access to the employer's E-

13  Verify and employment related documents and to its employees for interviews.  "Failure

14  to comply with the terms of this paragraph may lead DHS to terminate the Employer's

15  access to E-Verify."  (Facts, Ex. 7, Art. II § C ¶ 15.)

16     Employers are still subject to the Form I-9 obligations, but some are modified by

17  the E-Verify MOU.  The acceptable employee identifying documents are narrowed.  The

18  employer is subject to a civil money penalty for failure to notify DHS if it continues to

19  employ an individual after receiving a final nonconfirmation.  Of particular importance to

20  this case, "a rebuttable presumption is established that the Employer has not violated [8

21  U.S.C. § 1324a(a)(1)(A), the prohibition of hiring an unauthorized alien] . . . if it obtains

22  confirmation of the identity and employment eligibility of the individual in compliance

23  with the terms and conditions of E-Verify."  Conversely, "the Employer is subject to a

24  rebuttable presumption that it has knowingly employed an unauthorized alien in violation

25  of [8 U.S.C. § 1324a(a)(1)(A)] if the Employer continues to employ any employee after

26  receiving a final nonconfirmation."  No one "participating in E-Verify is civilly or

27  criminally liable under any law for any action taken in good faith on information provided

28  through the confirmation system."  (*Id.* at Art. II § C ¶ 6.)

1    According to the U.S. Citizenship and Immigration Services, "E-Verify is

2  currently the best means available for employers to verify electronically the employment

3  eligibility of their newly hired employees.  E-Verify virtually eliminates Social Security

4  mismatch letters, improves the accuracy of wage and tax reporting, protects jobs for

5  authorized U.S. workers, and helps U.S. employers maintain a legal workforce."  (Facts,

6  Ex. 9 at 1.)  A 2002 survey and evaluation observed that "an overwhelming majority of

7  employers participating found [E-Verify] to be an effective and reliable tool for

8  employment verification."  (Facts, Ex. 10 at v.)  After the program was implemented,

9  60% of employers found it "not at all burdensome."  Ninety-three percent reported that it

10  was easier than the I-9 process, and 92% reported that it did not overburden their staff.

11  (*Id.* at 33.)  In a 2006 SSA survey of fifty users with a large volume of verification

12  requests, 100% rated the program "Excellent," "Very Good," or "Good."  (Facts, Ex. 13

13  at 4.)  A majority of employers in the 2002 survey spent under $500 for E-Verify start-up

14  costs and under $500 annually for operating costs.  Annual operating costs averaged

15  $1,800, with about 85% spending less than $3,500.  (Facts, Ex. 10 at vi., 34.)

16    The same study found that less than one-tenth of 1% of employment verification

17  attempts resulted in a finding of "unauthorized."  It estimated that 10% of all cases

18  submitted were unauthorized workers, but very few of them contested the tentative

19  nonconfirmation.  (*Id.* at vi.)  E-Verify is not fraud proof and was not designed to detect

20  identity fraud.  (Facts, Ex. 15 at 6.)  However, a piloting photograph screening tool,

21  whereby an employer can more easily identify identity fraud, has been extended to all

22  users.  (Facts, Ex. 22B at 3–4.)

23  **II.    The Legal Arizona Workers Act**

24    The Legal Arizona Workers Act ("the Act"), A.R.S. § 23-211 through 23-214

25  (Supp. 2007), is a conscious State attempt to impose sanctions by "licensing and similar

26  laws" upon those who employ unauthorized aliens, as expressly permitted in 8 U.S.C. §

27  1324a(h)(2).  A principal issue in this case is whether the Act comes within that safe

28  harbor or spills over to the other "civil or criminal sanctions" forbidden to States.

1   The Act builds on the federal statutory prohibitions and the I-9 system, but avoids

2   making determinations of alien status or work authorization separate from those made by

3   the federal government.  It provides, "An employer shall not intentionally employ an

4   unauthorized alien or knowingly employ an unauthorized alien," incorporating the federal

5   definitions of "knowingly employ" and "unauthorized alien."  A.R.S. §§ 23-212(A), 23-

6   211(6) and (8).  The federal government provides its determination of "the work

7   authorization of the alleged unauthorized alien" to State officials and the State court

8   pursuant to 8 U.S.C. § 1373(c).  That determination is binding, though the State court

9   may request verification.  A.R.S. § 23-212(B) and (H).  The Act replicates the federal

10   "affirmative defense" that the employer "complied in good faith" with the I-9 system.

11   A.R.S. § 23-212(J).  However, as noted above, participation in E-Verify very much

12   affects the federal "affirmative defense" that the employer "complied in good faith" with

13   the I-9 system.

14   The Act also replicates the federal rebuttable presumption of compliance for

15   employers who have verified the employment authorization of their employees through E-

16   Verify.  A.R.S. § 23-212(I).  The Act goes further than federal law, however, and requires

17   employers to verify the eligibility of new hires through the E-Verify program after

18   December 31, 2008.  A.R.S. § 23-214.

19   The sanctions for violating A.R.S. § 23-212(A) vary.  For a first adjudicated

20   knowing violation during a three-year period, the employer is ordered to terminate the

21   employment of all unauthorized aliens, must file quarterly reports of new hires for a

22   three-year probation period, and is ordered to file an affidavit within three days that it has

23   terminated all unauthorized aliens and will not intentionally or knowingly employ an

24   unauthorized alien.  If the employer does not file the affidavit on time, its business

25   licenses are suspended until it does.  Even if the affidavit is filed on time, the court may

26   suspend the business licenses up to ten days after considering various factors.  A.R.S. §

27   23-212(F)(1).

28   For a first adjudicated intentional violation during a five-year period, the sanctions

1  are the same except that the probation and reporting period is five years and suspension of

2  business licenses is mandatory for a minimum of ten days.  A.R.S. § 21-212(F)(2).

3      For a second knowing or intentional violation during the period of probation,

4  business licenses are permanently revoked.  A.R.S. § 21-212(F)(3).

5      "License" means any state or local "authorization that is required by law and that

6  is issued . . . for the purposes of operating a business in this state."  A.R.S. § 23-211(7)(a).

7  It includes articles of incorporation, a certificate of partnership, a foreign corporation

8  registration, and a transaction privilege (sales tax) license, but not a professional license.

9  A.R.S. §§ 23-211(7)(b) and (c).  Obviously, both the punishment and the deterrence are

10 meant to be stiff.

11     The Act authorizes only county attorneys to bring proceedings under the Act.

12 A.R.S. §§ 23-212(C)(3), 23-212(D).  Both county attorneys and the Attorney General

13 may receive and shall investigate complaints of violation.  Upon concluding that a

14 complaint is not frivolous, the investigating officer shall notify federal immigration

15 authorities and the local law enforcement agency of the unauthorized alien, and the

16 Attorney General "shall notify the appropriate county attorney to bring an action" if the

17 complaint was filed with the Attorney General.  A.R.S. § 23-212(C).  The Attorney

18 General shall also maintain copies of court orders of enforcement.  A.R.S. § 23-212(G).

19 The Act required and the Director of the Department of Revenue did send a notice by

20 October 1, 2007, to all employers required to withhold income taxes informing them of

21 the terms of the Act.  2007 Ariz. Sess. Laws, Ch. 279, § 3. (Facts, Ex. 6.)

22 **III.    The Litigation and the Parties**

23     The Plaintiffs in No. CV 07-1355 are twelve non-profit corporations that are

24 associations of members and serve as public policy advocates for their members.  They

25 are referred to as the "Business-Group Plaintiffs."  Three are chambers of commerce

26 reflecting wide business interests, two are business associations interested in immigration

27 policy, and seven are trade associations in specific industries.  Ten are incorporated in

28 Arizona and have their principal place of business in Arizona.  Nine have employees in

Arizona. Wake Up Arizona!, the U.S. Chamber of Commerce, and the National Roofing Contractors Association have no Arizona employees, but they allege that some of their members have employees in Arizona. The latter two are not incorporated in Arizona, and there is no evidence they have any business license that could be sanctioned under the Legal Arizona Workers Act, but they allege that some of their members do have Arizona business licenses. (Facts, ¶¶ 1–6.)

Plaintiff Chicanos Por Law Causa, Inc., in No. CV 07-1684 (now consolidated with No. CV 07-1355) is an Arizona non-profit corporation with 600 Arizona employees. It is Arizona's largest community development corporation. Plaintiff Somos America, a coalition of diverse groups for comprehensive immigration reform, presents no allegation or evidence that it or any of its members have Arizona employees or are subject to the Act. It will be dismissed for lack of standing and will be omitted from the balance of the discussion in this order. (Facts, Ex. 23. ¶¶ 1–8.)

The Act will govern the remaining Plaintiffs and/or some of their members and will require them to use E-Verify to ascertain the employment eligibility of new employees. They will need to allocate employee time to install and learn software, complete a tutorial, sign the MOU, and submit information regarding their new employees. The cost will be at least several hundred to several thousand dollars per year.

All Plaintiffs contend that the Act violates the IRCA's preemption of "any State or local law imposing civil or criminal sanctions (other than through licensing or similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C. § 1324a(h)(2). They further assert that the differences between the Act and the IRCA conflict with federal law. They also argue that the voluntariness of E-Verify under federal law prohibits the State from requiring Arizona employers to participate as a part of the Arizona license sanction regulation.

The Business-Group Plaintiffs contend that the Act also violates procedural and substantive due process of law, the federal Commerce Clause, Arizona separation of powers, and the Fourth Amendment guarantee against unreasonable search and seizure.

The Defendants are the Governor and the Attorney General of the State of Arizona, and in the case of Chicanos Por La Causa, also the Director of the Department of Revenue.

All Plaintiffs claim injury and standing based on the expense of participating in E-Verify and seek declaratory relief and an injunction against enforcement of the Act.  The Business-Group Plaintiffs also claim injury and standing from threat of enforcement of the Act and from forced waiver of their Fourth Amendment rights by signing the E-Verify MOU.

**IV.  The Business-Group Plaintiffs Have No Standing to Challenge the Act Based on a Threat of Prosecution or Loss of Fourth Amendment Rights**

Article III of the Constitution limits the judicial power of federal courts to "cases" and "controversies."  *Flast v. Cohen*, 392 U.S. 83, 94 (1968).  Federal courts must maintain their proper role as arbiters of adversarial disputes and not stray into areas committed to other branches of government.  *Id.*  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976) (citing *Flast*, 392 U.S. at 95).  For a case or controversy to exist under Article III, a plaintiff must have standing to assert his legal claims, those claims must be ripe for review, and the harm must be redressable against the defendants.  *Renne v. Geary*, 501 U.S. 312, 320 (1991).

"[T]he standing question in its Art. III aspect 'is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf.'"  *Simon*, 426 U.S. at 38 (quoting *Warth v. Seldin*, 422 U.S. 490, 498–99 (1975)).  To have standing a plaintiff must have suffered an "injury in fact."  Such an injury is one that is concrete, particularized, actual, and imminent, not conjectural or hypothetical.  *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (citing *Lujan v. Defenders of Wildlife*, 504  U.S. 555, 560 (1992)).  The plaintiff must also

1    establish "a causal connection between the injury and the conduct complained of," and it

2    must be likely, not merely speculative, that the injury will be redressed by a favorable

3    decision. *Id.*

4    To the extent that the Business-Group Plaintiffs assert standing on behalf of their

5    members, they must show that 1) "their members would otherwise have standing to sue in

6    their own right;" 2) "the interests that they seek to protect are germane to the purposes of

7    their organizations;" and 3) "neither the claims asserted nor the relief requested requires

8    the participation of individual members in the lawsuit." *San Diego County Gun Rights*

9    *Comm.*, 98 F.3d at 1130–31 (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S.

10   333, 343 (1977)). Defendants do not challenge the Business-Group Plaintiffs'

11   associational standing.

12   **A.    There Is No Immanent Threat of License Proceedings Against the**
     **Business-Group Plaintiffs**

13   The Business-Group Plaintiffs have standing if they can prove a "genuine threat of

14   imminent prosecution" by the Defendants. *San Diego County Gun Rights Comm.*, 98

15   F.3d at 1126 (emphasis omitted). The credibility of a threat of prosecution turns on: 1)

16   "whether the plaintiffs have articulated a 'concrete plan' to violate the law in question,"

17   2) "whether the prosecuting authorities have communicated a specific warning or threat to

18   initiate proceedings," and 3) "the history of past prosecution or enforcement under the

19   statute." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir.

20   2000) (en banc) (citation omitted).

21   There is no threat of enforcement proceedings against the Business-Group

22   Plaintiffs by the Defendants or anyone else. The Business-Group Plaintiffs do not

23   knowingly employ or plan to employ any unauthorized alien. They rely solely on a press

24   release by the Maricopa County Attorney that announces his intent to enforce the Act

25   through a partnership with the Sheriff's Office. (Facts, Ex. 19.) That is a message to the

26   entire county, not to these Plaintiffs. "[A] general threat of prosecution is not enough to

27   confer standing." *San Diego County Gun Rights Comm.*, 98 F.3d at 1127. Plaintiffs have

28

1  presented no evidence of a specific threat directed at them or any of their members.

2  *Thomas*, 220 F.3d at 1140.  They therefore lack standing on this basis.

3  **B.  Signing the E-Verify Memorandum of Understanding Gives No Standing Because It Does Not Waive Fourth Amendment Rights**

4  The Business-Group Plaintiffs also claim injury from forced waiver of their Fourth

5  Amendment right to be free of warrantless federal searches of their employment records.

6  When they sign the MOU to participate in E-Verify, they must agree to give the federal

7  government access to employment records and employees for interviews.  If they later

8  refuse access, DHS may terminate their use of E-Verify, leaving the employer not in

9  compliance with State law.  Several threads run through this argument, but none ties to a

10  real injury.

11  Assuming for now that employers have privacy interests in the specified

12  documents and interviews sufficient to invoke the protections of the Fourth Amendment,

13  the MOU does not authorize warrantless searches.  *See Midwest Growers Coop. Corp. v.*

14  *Kirkemo,* 533 F.2d 455, 463 (9th Cir. 1976) (holding that a statute that allowed an agency

15  "access to and authority . . . to inspect, examine, and copy" business records did not

16  create a right of entry).  Signing the MOU therefore does not effect an immediate waiver

17  of Fourth Amendment rights.  Moreover, the employer may withdraw the consent to

18  access at any time.  *See United States v. McWeeney*, 454 F.3d 1030, 1034 (9th Cir. 2006)

19  (recognizing that a crime suspect "is free . . . after initially giving consent, to delimit or

20  withdraw his or her consent at anytime").  Finally, the MOU itself states the only

21  consequence that can result from failure to comply, and it is not a forcible search.  Rather,

22  DHS "may terminate the Employer's access to E-Verify."  (Facts, Ex. 7, Art.II § C ¶ 15.)

23  In no event could the federal government enter and search over the employer's objection.

24  If the MOU did pose some arguable threat to Fourth Amendment rights, or to

25  continued participation in E-Verify, it is far too speculative to occasion federal court

26  relief now.  A threatened injury must be "certainly impending" to constitute injury in fact,

27  not hypothetically occurring at some future time contingent upon the acts of others.

28

1    *Lujan*, 504 U.S. at 564 n.2 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).  It

2    is unknown whether DHS would terminate the Business-Group Plaintiffs' participation in

3    E-Verify for refusing to grant them warrantless access to their records.  The Business-

4    Group Plaintiffs provide no evidence that DHS has done so in the past or intends to do so

5    in the future.

6          It is helpful to recast the analysis in terms of ripeness.  By agreeing to the MOU,

7    the Business-Group Plaintiffs would currently lose nothing, for they later may refuse

8    warrantless searches and have the benefit of E-Verify participation in the meantime.  If at

9    some future time the federal government expelled them from E-Verify for refusing a

10   search, only then would they suffer a detriment.  But the detriment would not be loss of a

11   Fourth Amendment right.  It would be the inability to use E-Verify from that point

12   forward.  None of that is the business of the courts today.

13   **V.    Plaintiffs Would Have Standing to Challenge the Act Based on the Economic
          Cost of E-Verify if They Had Sued a Proper Defendant**

14

15        **A.    The Act Imposes Economic Injury on Plaintiffs if it Forces Them to
                Participate in E-Verify**

16        Plaintiffs contend that the Act imposes economic injury upon them by forcing

17   them to use E-Verify.  Even in the absence of a specific threat of enforcement

18   proceedings, a plaintiff may have standing based upon the economic cost of complying

19   with a law.  *National Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 856 (9th Cir. 2002);

20   *San Diego County Gun Rights Comm.*, 98 F.3d at 1130; *Cent. Ariz. Water Conservation*

21   *Dist. v. U.S. EPA*, 990 F.2d 1531, 1537 (9th Cir. 1993).  *Cf. Lake Carriers Ass'n v.*

22   *MacMullan*, 406 U.S. 498, 507–08 (1972) (holding that a case or controversy meets the

23   constitutional test for ripeness when a plaintiff must incur expense to prepare to comply

24   with a soon-to-become-effective statute).  Plaintiffs must incur some labor and out-of-

25   pocket costs to check the employment eligibility of new hires through E-Verify.  (Facts,

26   Ex. 10 at 34.)  They have thus demonstrated that they will sustain economic injury if the

27   law forces them to use E-Verify.

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.   The Act Causes Plaintiffs Economic Injury Only if its Operation or Enforcement Coerces Compliance With the E-Verify Requirement

"The mere existence of a proscriptive statute . . . [does not] satisf[y] the 'case or controversy' requirement." *Thomas*, 220 F.3d at 1139 (citing *San Diego County Gun Rights Comm.*, 98 F.3d at 1126–27).  Economic injury from a statute sufficient for standing must be "fairly traceable" to  the challenged statute and to the challenged actions of the defendants.  *San Diego County Gun Rights Comm.*, 98 F.3d at 1130 (citing *Lujan*, 504 U.S. at 560).  "A justiciable controversy does not exist where 'compliance with [challenged] statutes is uncoerced by the risk of their enforcement.'" *Lake Carriers Ass'n*, 406 U.S. at 507 (alteration in original) (quoting *Poe v. Ullman*, 367 U.S. 497, 508 (1961)).  "A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

As a threshold matter, Chicanos Por La Causa contends that A.R.S. § 23-214 forces them to enroll simply because "it is important in our country for all people to follow the law" and because "we are called upon to certify in various documents that we are not in violation of any laws."  (Facts, Ex. 21 ¶ 4.)  Such honorable intentions are not enough for standing.  Plaintiffs must show that the operation or enforcement of the statute causes them to incur an economic injury.  Chicanos Por La Causa points to no specific, imminent need to certify compliance with State law.  Nor has it shown a specific consequence for not certifying, or identified the officer who would visit that consequence upon it.  The Business-Group Plaintiffs' belated argument on this point at trial went beyond its pleadings and the evidence, and they failed to show that a proper defendant is before the court.  These grounds do not prove that the Act forces Plaintiffs to participate in E-Verify.

Plaintiffs can show that their economic injury is fairly traceable to the Act if they have a reasonable expectation that the defendants might bring an enforcement action

1   against them if they do not comply.  For example, professional trappers who endured

2   economic injury when they ceased trapping to comply with a new law had standing to sue

3   the law's enforcement officer.  *National Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 856

4   (9th Cir. 2002).  Even though they had received no specific threat of enforcement, they

5   reasonably expected that the law might be enforced against them if they continued to trap

6   because of "(1) the newness of the statute; (2) the explicit prohibition against trapping

7   contained in the text of [the statute]; (3) the state's unambiguous press release mandating

8   the removal of all traps banned under [the statute]; (4) the amendment of state regulations

9   to incorporate the provisions of [the statute]; and (5) the prosecution of one private

10  trapper under [the statute]."  *Id.*

11          This case presents almost all of the *National Audubon Society* factors.  The

12  Arizona Act is new, it explicitly requires employers to use E-Verify, the State has mailed

13  notice to every employer in the State that they must comply with the terms of the Act, and

14  at least one county attorney has issued a press release expressing his intent to enforce the

15  Act's prohibition on employing unauthorized aliens.  No person has been prosecuted

16  under the Act because it has not yet taken effect, but there is no doubt that enforcement

17  proceedings will occur.  Plaintiffs have a reasonable expectation that the county attorney

18  might enforce the Act against them if he obtains evidence that they employ unauthorized

19  aliens after December 31, 2007.

20          The difference between *National Audubon Society* and this case is that the Act

21  contains no explicit penalty solely for failing to use E-Verify.  Although section 23-214

22  of the Arizona Act requires all business employers to participate in E-Verify, it authorizes

23  no officer of the State to bring any form of enforcement action and provides no express

24  civil or criminal penalty for noncompliance with that requirement.  However, the Act may

25  still cause Plaintiffs' economic injury if it coerces them to use E-Verify through the

26  operation of section 23-212, which authorizes enforcement of the prohibition on

27  employing unauthorized aliens.

28

1      **C.      The Operation of the Act Coerces Employers to Participate in E-Verify**

2           Plaintiffs contend that the State coerces them to enroll in E-Verify by denying

3      them the "rebuttable presumption that [the] employer did not intentionally employ an

4      unauthorized alien or knowingly employ an unauthorized alien" in the event of an

5      enforcement action.  A.R.S. § 23-212(I).  This replicates the rebuttable presumption that

6      the E-Verify MOU gives to employers in federal enforcement proceedings.

7           The "rebuttable presumption" proves little more than what is already true: an

8      employer who confirms a new hire's employment eligibility through E-Verify has strong

9      evidence that it did not knowingly or intentionally employ an unauthorized alien.  Even if

10     section 23-212(I) and the MOU did not call it a "rebuttable presumption," exonerating

11     evidence from the federal government's own records and investigation would be

12     dispositive in the employer's favor unless it can be proved that the federal data are wrong

13     and the employer knew it.  That is a tall task in most situations.  Standing alone, it is not

14     coercion when the law recognizes the persuasive or even compelling force of evidence for

15     those who ferret it out.  Seeking good evidence is usually a choice, and a plaintiff cannot

16     rely upon its own choice to establish injury and standing.  *DMJ Assocs., L.L.C. v.*

17     *Capasso*, 288 F. Supp. 2d 262, 267 (E.D.N.Y. 2003) (citing *Jackson-Bey v. Hanslmaier*,

18     115 F.3d 1091, 1095 (2d Cir. 1997)).

19          However, the rebuttable presumption of section 23-212(I) does not stand alone.

20     Ordinarily an employer who complies in good-faith with the federal I-9 verification

21     system obtains an affirmative defense that it did not knowingly employ an unauthorized

22     alien.  8 U.S.C. §1324a(a)(3).  An employer presumptively is not in violation of federal

23     law if it examines documentation listed on the I-9 in good faith and the documentation

24     "reasonably appears on its face to be genuine."  8 U.S.C. § 1324a(b).  But where an

25     employer has been through the E-Verify system, the defense of good faith I-9 compliance

26     may recede into insignificance.  For determining good faith, facially genuine but fraud-

27     friendly I-9 identifying documents will not matter much if the employer also knows that

28     the government's data and investigation, after dialog with the employee, show the

1  employee is unauthorized.  E-Verify does not repeal the I-9 defense, but rather swamps it

2  with far better evidence.

3      The same may be true under the Arizona law.  The Act replicates the federal law

4  affirmative defense for good faith I-9 compliance, A.R.S. § 23-212(J), but in any

5  enforcement proceeding the State will obtain the federal government's data on the

6  employee's immigration status under 8 U.S.C. § 1373(c).  The State court may consider

7  only that evidence "[o]n determining whether the employee is an unauthorized alien."

8  A.R.S. § 23-212(H).  The employer's liability for license sanctions will likely turn only

9  on whether the State proves the employer's knowledge or intent to employ an

10  unauthorized alien.

11      Because the Arizona Act requires employers to use E-Verify, the Act may be read

12  to charge employers with knowledge of the E-Verify data that they wrongfully refuse to

13  obtain, just as the MOU charges E-Verify users with knowledge of the data for federal

14  enforcement purposes.  To read the Act differently risks reducing it to state-level

15  duplication of the same failed federal system of enforcement that the Legislature meant to

16  strengthen.  The State plainly made E-Verify mandatory.  A.R.S. § 23-214.  It did so in

17  the hopes of taking "the most aggressive action in the country against employers who

18  knowingly or intentionally hire undocumented workers" because "Congress finds itself

19  incapable of coping with the comprehensive immigration reforms our country needs."

20  (Signing statement of Gov. Napilitano, July 2, 2007, Facts, Ex. 2.)

21      The court need not discern now the exact meaning and effect of A.R.S. §§ 23-

22  212(I), 23-212(J), and 23-214.  The Arizona courts may do that in the course of

23  administering the Act.  It is enough at the threshold of this case that Plaintiffs reasonably

24  fear that if they do not use E-Verify and a new employee turns out to be unauthorized,

25  they may have no good faith defense to the Act's harsh sanctions.  State courts may read

26  the Act to hold them accountable for the knowledge from which they unlawfully averted

27  their eyes.

28      This case is different from *National Audubon Society* and other cases where cost of

compliance was forced and therefore provided standing.  Unlike those cases, Plaintiffs'
failure to use E-Verify does not violate the primary prohibition of the statute, which here
is against hiring known unauthorized aliens.  Failure to comply with E-Verify may
increase the number of unauthorized aliens that an employer employs, especially in some
industries; but unlike *National Audubon Society*, it will not directly bring greater attention
from prosecutors.  Therefore, the refusal to comply with E-Verify will not increase an
employer's apprehension of being prosecuted to the same extent as in other cases.

On balance, the court concludes in the circumstances of this case that Plaintiffs'
participation in E-Verify is not voluntary and is "fairly traceable" to the Act.  The design
of the Act is to coerce compliance with E-Verify less by the nearness of prosecution than
by the intolerable punishment resulting from prosecutions, which usually will be
undefendable without E-Verify compliance.  *In terrorem* laws force low-cost compliance
even with thin enforcement.

Yet the Act does not rely on that alone.  Widespread enforcement is promised,
funded with appropriations.  The likelihood of general prosecution is proven.  The
prospect of actual enforcement against any employer forgoing E-Verify is not so remote as
to unlink prosecution from the felt compulsion to use E-Verify.  The operation of the Act
therefore coerces Plaintiffs to endure economic injury, and if they have sued a proper
defendant, they have standing to challenge the provisions of the Act that require them to
use E-Verify.

Plaintiffs must demonstrate that they meet Article III's case or controversy
requirement independently for each provision of the Act they seek to challenge.  *Clark v.
City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001) ("[A] plaintiff may have standing to
challenge some provisions of a law, but not others.") (citing *4805 Convoy, Inc. v. San
Diego*, 183 F.3d 1108, 1112–13 (9th Cir. 1999)); *Camp Legal Def. Fund, Inc. v. City of
Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006) (citing *FW/PBS, Inc. v. Dallas*, 493 U.S.
215, 233 (1990), *modified in part on other grounds in City of Littleton v. Z. J. Gifts D-4,
L.L.C.*, 541 U.S. 774, 782 (2004)).  Therefore, even if Plaintiffs have sued a proper

1    defendant, their economic injury allows them to challenge only those aspects of the Act

2    that logically compel them to use E-Verify.

3    **VI.    Suit Against the Governor, Attorney General, and Director Does Not Satisfy
         Constitutional Causation and Redressability Requirements**

4

         **A.    In General a Proper Defendant Must Have Authority to Enforce the
              Challenged Law or Have Threatened to Do So**

5

6         The Governor, the Attorney General, and the Director contend that they are not

7    proper defendants to this action.  Before addressing the precise question of whether

8    Plaintiffs may properly sue them for coerced participation in E-Verify, it is helpful to

9    understand how the principles of causation and redressability apply in suits against state

10   officers.  "It is well-established that when a plaintiff brings a pre-enforcement challenge to

11   the constitutionality of a particular statutory provision, the causation element of standing

12   requires the named defendants to possess authority to enforce the complained-of

13   provision." *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007) (citations omitted).

14   There must be "the requisite causal connection between their responsibilities and any

15   injury that the plaintiffs might suffer, such that relief against the defendants would provide

16   redress." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004)

17   (citations omitted).

18        The Act allows only county attorneys to bring enforcement actions against

19   employers for noncompliance.  A.R.S. § 23-212(C).  The Director has carried out his duty

20   to send notice to Arizona employers explaining the Act's requirements and providing

21   instructions on how to register for E-Verify.  2007 Ariz. Sess. Laws, ch. 279 § 3.  (Facts,

22   Ex. 6.)  An injunction to send a curative notice would be empty, for Plaintiffs have advice

23   from their counsel in this litigation and need no further notice about the Act from the

24   Director.  The Act does not charge the Governor with any specific duty, and her general

25   duty to ensure that the laws are faithfully executed is not sufficient to make her a party to

26   this challenge. *Shell Oil Co. v. Noel*, 608 F.2d 208, 212–13 (1st Cir. 1979). *Cf. L.A.*

27   *County Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) ("[A] generalized duty to

28   enforce state law . . . will not subject an official to suit.") (citations omitted).  An

1   injunction against either of these officials would not prevent enforcement actions under the

2   Act or otherwise diminish its coercive effect.

3          The Attorney General has the authority to investigate and refer complaints to

4   county attorneys for enforcement.  A.R.S. § 23-212(B), (C).  No language in the Act

5   deprives a county attorney of the normal discretion to decide whether to proceed with an

6   enforcement action, even where the Attorney General has referred a complaint to the

7   county attorney.  Therefore, even if a county attorney directly threatened enforcement

8   proceedings against Plaintiffs, this case would fall under the rule that "[w]here an attorney

9   general cannot direct, in a binding fashion, the prosecutorial activities of the officers who

10  actually enforce the law or bring his own prosecution, he may not be a proper defendant."

11  *Wasden*, 376 F.3d at 919 (citations omitted).

12         Plaintiffs would have standing to sue the Attorney General if he specifically

13  threatened to refer a complaint against Plaintiffs to a county attorney for enforcement, or if

14  he specifically threatened to bring enforcement proceedings himself, even though he lacks

15  the power to do so.  *Culinary Workers Union v. Del Papa*, 200 F.3d 614, 617–18 (9th Cir.

16  1999) (distinguishing *Southern Pacific Transportation Co. v. Brown*, 651 F.2d 613 (9th

17  Cir. 1980), and *Snoeck v. Brussa*, 153 F.3d 984 (9th Cir. 1998), where the attorneys

18  general could not be sued because they had no authority and made no threats).  The

19  Attorney General has not, however, made any specific threat against the Plaintiffs.  The

20  court must therefore determine whether the Attorney General's powers are the source of

21  Plaintiffs' economic injury.

22         **B.      The Attorney General Does Not Cause Plaintiffs' Economic Injury**

23         A plaintiff enduring an economic injury fairly traceable to a challenged statute must

24  also sue a defendant whose acts cause his economic injury and against whom redress will

25  be effective.  *San Diego County Gun Rights Comm.*, 98 F.3d at 1130; *Bronson v. Swensen*,

26  500 F.3d 1099, 1110, 1112 (10th Cir. 2007).  Since the E-Verify requirement has no

27  explicit enforcement provision, the consequence for failing to use it arises only in license

28  sanction proceedings.  In the special case of injury from cost of compliance, it is settled

1  that a judgment against an officer who can bring enforcement proceedings is proper

2  redress, even if the officer has made no specific threat of enforcement.  *National Audubon*

3  *Soc'y*, 307 F.3d at 856.  It is also settled that the court can provide no redress against a

4  state officer without power to enforce the statute.  *Nova Health Systems v. Gandy*, 416

5  F.3d 1149, 1158 (10th Cir. 2005).  To say otherwise would "confuse[] the statute's

6  immediate coercive effect on the plaintiffs with any coercive effect that might be applied

7  by the defendants."  *Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001) (en banc).

8         The causation element of standing requires that the Attorney General have enough

9  connection to Plaintiffs' injury that a judgment against him will protect them from having

10 to participate in E-Verify.  The parties cite no authority, and the court has found none,

11 where a plaintiff sought relief for cost-of-compliance injury against an officer who had a

12 facilitative role in enforcement, such as investigation or referral, but who had no direct

13 enforcement power.  Therefore, the general principle governing this issue is that redress is

14 speculative if it turns on the independent acts of third parties, here the county attorneys.

15 *San Diego County Gun Rights Comm.*, 98 F.3d at 1130 (plaintiffs did not have standing to

16 sue because it was "third-party weapon dealers and manufacturers — not the government

17 defendants — who [had] raised the prices of assault weapons").

18        *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908 (9th Cir. 2004), does

19 not lead to a different conclusion.  There, the Idaho Attorney General was held amenable

20 to suit by a physician to enjoin a parental consent statute for minors' abortions.  *Id*. at 920.

21 Though not threatened explicitly with enforcement, he stated "a clear intention to continue

22 to perform abortions" for his minor patients and therefore had "a reasonable fear [the]

23 statute would be enforced against [him]."  *Id.* at 917 (citing *California Pro-Life Council,*

24 *Inc. v. Getman*, 328 F.3d 1088, 1094–95 (9th Cir. 2003)).  The attorney general was a

25 proper defendant because, by law, he could "assist" a prosecuting attorney, and state

26 courts had ruled that "unless the county prosecutor objects, 'the attorney general may, in

27 his assistance, do every act that the county attorney can perform.'"  *Id.* 919–20 (quoting

28 *Newman v. Lance*, 129 Idaho 98, 922 P.2d 395, 399–401 (1996)) (emphasis omitted).

1    Because the attorney general was able to "deputize himself" to enforce the statute in the

2    place of the county attorney, the court concluded that an injunction against him would

3    redress the plaintiff's injury. *Id.*

4            The Arizona Attorney General has general supervisory authority over the county

5    attorneys, A.R.S. § 41-193(4), and the authority to "assist" the county attorneys in their

6    duties "at the direction of the Governor, or when deemed necessary." A.R.S. §41-

7    193(A)(5). The Attorney General may prosecute crimes when requested by a county

8    attorney. *State v. Duran*, 118 Ariz. 239, 242–43, 575 P.2d 1265, 1268–69 (Ct. App.

9    1978). On the other hand, no Arizona court has held that the Attorney General "may, in

10   his assistance, do every act" that a county attorney can perform, even without objection of

11   the county attorney. *Wasden*, 376 F.3d at 920.

12           Unlike the physician in *Wasden*, Plaintiffs disavow any intention of violating the

13   law. Further, *Wasden* was a challenge to an abortion law, and several courts of appeals

14   have held that the Supreme Court relaxed standing requirements for abortion cases in *Doe*

15   *v. Bolton*, 410 U.S. 179 (1973). *Margaret S. v. Edwards*, 794 F.2d 994, 997 (5th Cir.

16   1986); *Planned Parenthood Ass'n v. Cincinnati*, 822 F.2d 1390, 1396 n.4 (6th Cir. 1987);

17   *Reprod. Health Serv. v. Webster*, 851 F.2d 1071, 1075 (8th Cir. 1988) *rev'd on other*

18   *grounds*, 492 U.S. 490 (1989). *See also Wasden*, 376 F.3d at 917 (citing *Doe*, 410 U.S. at

19   188).

20           The Attorney General does not contend that his general power to "assist" county

21   attorneys grants him power to enforce the Act in place of the county attorneys. In a

22   challenge to a statute that vests enforcement in the county attorneys, an attorney general

23   who has non-binding supervisory power is not a proper defendant unless there is "a real

24   likelihood that the state official will employ his supervisory powers against plaintiffs'

25   interests." *Long v. Van de Kamp*, 961 F.2d 151, 152 (9th Cir. 1992). *See also Reprod.*

26   *Health Servs. of Planned Parenthood of the St. Louis Region v. Nixon*, 428 F.3d 1139,

27   1145 (8th Cir. 2005) (holding that the attorney general was not a proper party despite his

28   authority to aid prosecutors because his use of that power was not imminent); *Falwell v.*

1  *City of Lynchburg*, 198 F. Supp. 2d 765, 776 (W.D. Va. 2002) ("In this case, the Plaintiffs

2  have alleged only that the Attorney General may, at some future time, via some

3  hypothetical mechanism, enforce [the law] against them.").

4        The true source of Plaintiffs' forced use of E-Verify is the county attorneys' power

5  to instigate an enforcement action.  As against the Attorney General, Plaintiffs have not

6  shown a "substantial likelihood that the relief requested will redress its injury" of forced

7  E-Verify compliance.  *Gandy*, 416 F.3d at 1158 (citations omitted).

8        IT IS THEREFORE ORDERED that the Clerk enter judgment dismissing this

9  action without prejudice for lack of subject matter jurisdiction, there being no justiciable

10  case or controversy against the Defendants.

11        DATED this 7th day of December 2007.

12

13  _____

14                    Neil V. Wake
                United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28