**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| ARIZONA CONTRACTORS ASSOCIATION, INC., an Arizona non-profit corporation; ARIZONA EMPLOYERS FOR IMMIGRATION REFORM, INC., an Arizona non-profit corporation; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, a Washington D.C. non-profit corporation; ARIZONA CHAMBER OF COMMERCE, an Arizona non-profit corporation; ARIZONA HISPANIC CHAMBER OF COMMERCE, INC., an Arizona non-profit corporation; ARIZONA FARM BUREAU FEDERATION, an Arizona non-profit corporation; ARIZONA RESTAURANT AND HOSPITALITY ASSOCIATION, an Arizona non-profit corporation; ASSOCIATED MINORITY CONTRACTORS OF AMERICA, an Arizona non-profit limited liability company; ARIZONA ROOFING CONTRACTORS ASSOCIATION, an Arizona non-profit corporation; NATIONAL ROOFING CONTRACTORS' ASSOCIATION, an Illinois not-for-profit corporation; WAKE UP ARIZONA! INC., an Arizona non-profit corporation; and ARIZONA LANDSCAPE CONTRACTORS ASSOCIATION, INC., an Arizona non-profit corporation, <br><br>                    Plaintiffs, <br><br> vs. | No. CV07-1355-PHX-NVW (lead) <br> No. CV07-1684-PHX-NVW (member) <br><br> **ORDER** |

JANET NAPOLITANO, Governor of the State of Arizona; TERRY GODDARD, Attorney General of the State of Arizona, )
)
)
)
)
)
Defendants. )
)
_____ )
CHICANOS POR LA CAUSA, INC.; and SOMOS AMERICA, )
)
)
Plaintiffs, )
)
)
vs. )
)
)
JANET NAPOLITANO, in her official capacity as Governor of the State of Arizona; TERRY GODDARD, in his official capacity as Attorney General of the State of Arizona; and GALE GARRIOTT, in his official capacity as the Director of the Arizona Department of Revenue, )
)
)
)
)
)
)
)
)
)
Defendants. )
)
_____ )

## I.   Nature of the Motion and Related Proceedings

Plaintiffs have appealed the December 7, 2007 judgment dismissing this action without prejudice for lack of a justiciable case or controversy against these Defendants. They now seek an injunction preventing the Defendants from implementing or enforcing the Legal Arizona Workers Act, A.R.S. §§ 23-211 through 214 (the Act), for the duration of the appeal.  Fed. R. Civ. P. 62(c).  (Doc. ## 91 and 94.)  The court's corrected Findings of Fact and Conclusions of Law (Doc. # 87) and Judgment thereon (Doc. # 85) principally concluded: (1) that Plaintiffs lack standing based on imminent threat of enforcement, as they proved no threat by anyone, including the Defendants; (2) that Plaintiffs proved cost-of-compliance injury from forced participation in E-Verify sufficient for standing if they sued a proper defendant; and (3) that redress would not be effective against the Defendants Governor, Attorney General, and Director of the Department of Revenue because the Act does not give them the enforcement power that coerces participation in E-Verify.

1        Both groups of Plaintiffs have filed new actions on December 10 and 12, 2007,

2   adding one or all of the county attorneys as defendants and seeking interim injunctive

3   relief identical to what is sought here as an injunction pending appeal.  Those actions are

4   now consolidated under *Arizona Contractors Association, Inc. v. Candelaria*, No. CV 07-

5   2496 PHX-NVW ("*Arizona Contractors II*").  On December 18, 2007, the court held a

6   case management conference and set a hearing for January 16, 2008, on the motions for

7   preliminary injunction.

8        Plaintiffs' motions for temporary restraining order in *Arizona Contractors II* were

9   heard on December 18, 2007.  The county attorney Defendants acknowledged that it

10  would take them weeks or months to investigate complaints and prepare to initiate any

11  proceedings under the Act.  They avowed that, though they will carry out their duties

12  without intentionally delaying, they could and would bring no proceedings before

13  February.  If, because of extraordinary or unforeseeable events, they were able and

14  thought it necessary to bring proceedings before then, they would advise the court and

15  Plaintiffs in time for them to seek a temporary restraining order.  Thus, the immediate

16  relief against enforcement sought in these motions and by the motions for temporary

17  restraining order in *Arizona Contractors II* is now unnecessary and could not become

18  necessary until February at the earliest.  By that time the court will have heard and ruled

19  on the motions for preliminary injunction in *Arizona Contractors II*.

20       Despite that withdrawal of any need for interim injunctive relief against the

21  enforcing officers before February, Plaintiffs continue to seek an immediate injunction

22  against compliance with E-Verify.  They no longer seek an order against anyone who will

23  do anything to them during the term of the injunction.  Rather, they effectively seek a

24  declaratory judgment to commence and run for a limited time period, but with permanent

25  effect thereafter, absolving them from any liability for not using E-Verify.  The relief

26  sought in these motions for injunction pending appeal and in the motions for temporary

27  restraining order in *Arizona Contractors II* has been transformed.

28       By separate order this day, the motions for temporary restraining order in *Arizona*

1   *Contractors II* are denied for the following reasons: (1) there is insufficient likelihood

2   that Plaintiffs will succeed on issues that demand remedies in the short term; (2) it may be

3   improper to issue a temporary restraining order that is really a declaratory judgment; (3)

4   the balance of hardships tips against Plaintiffs rather than for them; and (4) there will be

5   full opportunity at the January 16, 2008 preliminary injunction hearing to address issues

6   that may occasion interim relief thereafter.

7   **II.      Standards for Injunction Pending an Appeal**

8           An injunction pending appeal under Federal Rule of Civil Procedure 62(c) is an

9   extraordinary remedy that should be granted sparingly.  *Reading & Bates Petroleum Co.*

10  *v. Musslewhite*, 14 F.3d 271, 275 (5th Cir. 1994) ("Stays pending appeal constitute

11  extraordinary relief."); *United States v. Texas*, 523 F. Supp. 703, 729 (E.D. Tex. 1981)

12  ("Since such an action interrupts the ordinary process of judicial review and postpones

13  relief for the prevailing party at trial, the stay of an equitable order is an extraordinary

14  device which should be sparingly granted.").

15          Four factors must be considered on Rule 62(c) motions: "(1) whether the stay

16  applicant has made a strong showing that he is likely to succeed on the merits; (2)

17  whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the

18  stay will substantially injure the other parties interested in the proceeding; and (4) where

19  the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *NRDC v. Winter*,

20  502 F.3d 859, 863 (9th Cir. 2007) (noting the importance of the public interest factor)

21  (citations omitted).  *See also Alaska Conservation Council v. U.S. Army Corps of Eng'rs*,

22  472 F.3d 1097, 1100 (9th Cir. 2006) ("[T]he moving party [must] demonstrate 'either a

23  combination of probable success on the merits and the possibility of irreparable injury or

24  that serious questions are raised and the balance of hardships tips sharply in his favor.'").

25          "The requirement of a 'strong showing' of likelihood of success on the merits is

26  more stringent than the 'reasonable probability' standard that is applicable to an

27  application for a preliminary injunction."  *Davis v. Meyers*, 101 F.R.D. 67, 69 (D. Nev.

28  1984) (citing *Bayless v. Martine*, 430 F.2d 873, 879 (5th Cir. 1970)).  It is sometimes said

1    that the "success on the merits factor cannot be rigidly applied," and that "district courts

2    properly 'stay their own orders when they have ruled on an admittedly difficult legal

3    question.'" *Pac. Merch. Shipping Ass'n v. Cackette*,  No. Civ. S-06-2791, 2007 U.S.

4    Dist. LEXIS 76933 at *6, 2007 WL 2914961 at *2 (E.D. Cal. Oct. 5, 2007) (citations

5    omitted).  "However, the *Hilton* test is only to be reformulated in this manner when the

6    movant has made a strong showing as to the other three *Hilton* factors." *Digital

7    Commc'ns. Network, Inc. v. AB Cellular Holding LLC*, Case No. 99-5418, 1999 U.S.

8    Dist. LEXIS 15107 at *18, 1999 WL 1044234 at *6 (C.D. Cal. Aug. 19, 1999) ("Because

9    Plaintiffs have not made a strong showing as to the other three *Hilton* factors, the Court

10   declines to give the Plaintiffs a 'break' on the question of strong likelihood of success on

11   the merits.") (citations omitted).

12       "In a case in which 'the moving party seeks to stay governmental action taken in

13   the public interest pursuant to a statutory or regulatory scheme,' the injunction should be

14   granted only if the moving party meets the more rigorous likelihood-of-success standard."

15   *Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir. 1996) (citing *Plaza Health Labs., Inc.

16   v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989)); *Tunick v. Safir*, 209 F.3d 67, 70 (2d Cir.

17   2000).  The movant also must make a "strong showing" of likelihood of success where

18   the irreparable injury it claims is merely prospective monetary damages.  "Traditionally,

19   the irreparable injury contemplated by Rule 62(c) is that which will make the appeal

20   moot.  Thus, prospective monetary damage is *not* irreparable injury." *Stop H-3 Ass'n v.

21   Volpe*, 353 F. Supp. 14, 18 (D. Haw. 1972) *rev'd on other grounds*, 533 F.2d 434 (9th

22   Cir. 1976) (citations omitted).

23       In this case, an injunction pending appeal is not needed to protect the jurisdiction

24   of the appellate courts from mootness or other threat.  Appellate jurisdiction of this case is

25   secure whether or not the Act is enjoined in the meantime.  Rather, the injunction

26   deprives the Act's beneficiaries of its substantive protection for the extended period of an

27   appeal and causes other harms, despite the court's probable lack of jurisdiction to give

28   that substantive relief.  This suggests that a strong likelihood of success on the merits

ought to be necessary to issue an injunction pending appeal that grants substantive relief.

Another circumstance of this case also suggests that more be demanded for an injunction pending appeal. Plaintiffs' new suit *Arizona Contractors II* is identical, except that it is against proper defendants and has subject matter jurisdiction, and is pending and ready for a preliminary injunction ruling in January.

**III.   Plaintiffs Have Little Hardship from Participating in E-Verify, and the Balance of Hardships is Strongly Against an Injunction Pending Appeal**

**A.   Plaintiffs' Hardship is Minimal**

Plaintiffs offer mostly sweeping generalities for the hardship they must show to warrant an injunction pending appeal or a temporary restraining order before the January 16, 2008 preliminary injunction hearing in *Arizona Contractors II*. The hardship comes down to nothing more concrete than the expense of using E-Verify. Counsel admitted at trial that no Plaintiff lacks a computer or internet access. The only cost is employee time in learning the program, submitting the names of new hires after January 1, 2008, and assisting new employees who wish to communicate with the federal government to resolve out-of-date government records. That would be a few hundred to a few thousand dollars a year for the large majority of employers. (Doc. # 87 at 8, 11.)

If Plaintiffs bear this hardship of complying with the Act, there will be no other hardship because the Act itself effectively assures that compliance with E-Verify will avoid virtually all license sanction proceedings and defeat any that are brought. (Doc. # 87 at 9, 18–19.) If lawful workers with tentative nonconfirmations show the basis, the E-Verify process itself assures that their government records will be updated and their employers will not be charged with violating the Act.

The hardship of using E-Verify is an increment to the already pervasive regulation of labor and employment in our society. The cost of it meets the minimum for standing, but no Plaintiff showed at trial that the actual cost will be material in the context of its business operations. *See Yniguez v. Mofford*, 730 F. Supp. 309, 317 (D. Ariz. 1990) *rev'd on other grounds*, 939 F.2d 727 (9th Cir. 1991) ("While Yniguez has established a

sufficient threat of enforcement to provide an actual controversy for purposes of Article III and the Declaratory Judgment Act, she has not established an enforcement threat sufficient to warrant injunctive relief."); *Lawson v. Hill*, 368 F.3d 955, 959 (7th Cir. 2004) ("Even if we are wrong to suppose the risk of prosecution too remote to confer standing to sue . . . the district judge was right not to enter an injunction . . . . [A]n injunction is an extraordinary remedy.").  Moreover, complying with E-Verify, unwelcome though it may be for other reasons, will have off-setting business benefits for Plaintiffs.  If historical statistics hold true, 92% of them will find it easier than the I-9 process alone.  An overwhelming majority will find it an effective and reliable tool for employment verification.  All of them will rate the program "Excellent," "Very Good," or "Good."  (Doc. # 87 at 8.)  The one thing it will not do is allow them to keep hiring nearly as many unknown unauthorized aliens, but that is not a "hardship" that could count under the law.

The hardship that could count from complying with the Act while the court of appeals considers this case, which is having to participate in E-Verify, is insignificant in practical terms for all but the fewest of businesses.  No Plaintiff presented evidence at trial, or credible evidence since trial, that the cost of E-Verify compliance for it or any of its members will be significant.

Moreover, since no county attorney could bring an enforcement proceeding before completion of preliminary injunction proceedings in *Arizona Contractors II*, the justification for emergency injunctive relief or a restraining order — to stop someone from doing something harmful — is absent.  Plaintiffs now reach beyond asking for protection from imminent government action and instead are demanding a binding adjudication that absolves them from the legal effect of the Act.  Plaintiffs offer no authority for this kind of declaratory judgment relief at the commencement of a case, or upon the appeal of a case where jurisdiction was lacking, when no overt acts of harm are threatened by any Defendant.

## B. An Injunction Will Gravely Injure the Interests of the State, the Interests of Others, and the Public Interest

Plaintiffs' motions wholly fail to acknowledge the harm to the interests of the State, the interests of others, and the public interest from an injunction pending appeal or temporary restraining order. Those ignored harms can be listed in somewhat ascending order as follows.

1. The State's expenditure to inform every employer by October 1, 2007, of the Act and of the obligation to comply with E-Verify after December 31, 2007, would be wasted. 2007 Ariz. Sess. Laws, Ch. 279, § 3. (Joint Statement of Facts, Doc. # 72 ("Facts") Ex. 6.) Giving individuals actual notice of the law, when it begins, and how to avoid risk by complying with E-Verify, was critical to the legislature's purpose of achieving effective deterrence with the fewest number of employers suffering actual sanctions. If the effective date of the Act is delayed by court order, that legislative purpose of fairness by giving individual notices would be defeated unless a new notice is sent when the Act is allowed to go into effect. This suggests that such delay must be denied or that Plaintiffs must post a bond to cover the cost of a new notice under Rule 62(c) in the appeal or Rule 65(c) in *Arizona Contractors II.*

At the December 18, 2007 hearing, the Executive Branch of the State of Arizona spoke in two voices. Counsel for the Attorney General took the position that no second notice would be necessary after an injunction is lifted because the Act does not speak to it and no money is appropriated to pay for it. Counsel for the Governor took the position that a second notice would be necessary to repair the harm of an injunction. The court concludes that the Governor has the better understanding of the Act and of the consequences of an interim injunction. This either weighs against an interim injunction or weighs in favor of requiring a bond from Plaintiffs to cover the cost of a second notice.

2. Confusion would arise among employers, with the prospect of serious prejudice to some. Of approximately 150,000 employers in Arizona, the large majority apparently have not yet enrolled in E-Verify. An injunction easily could cause many to

1  think they are excused from the Act and from E-Verify compliance, perhaps permanently,

2  even though this is not a class action and an injunction would protect only the Plaintiffs.

3  If Plaintiffs' case fails in the end, many employers could in good faith find themselves

4  exposed to the Act's harsh sanctions because they did not know when to comply.  The

5  risk of catastrophic loss to other employers from a confusion-causing injunction

6  outweighs the minimal cost to Plaintiffs from compliance.

7        The harm of confusion would be multiplied by the legal uncertainty about whether

8  an injunction that restrains an officer's conduct would grant anyone any long-term

9  protection.  It is only certain that an injunction would prevent the commencement or

10  maintenance of enforcement proceedings until the injunction is lifted.  If the injunction

11  were lifted, the county attorneys would not be barred from bringing future proceedings

12  for violations that occurred during the term of the temporary injunction, and it is unsettled

13  whether the interim injunction would be a defense to the later enforcement actions.

14  *Edgar v. MITE Corp*., 457 U.S. 624, 630 (1982) (noting that the issue is unresolved);

15  *Farmers Union Cent. Exch. v. Thomas*, 881 F.2d 757, 760 (9th Cir. 1989) (whether the

16  interim injunction is a defense would have to be decided in the later enforcement action

17  itself).  These are risks with grave consequences to the public, even if Plaintiffs are

18  willing to take them.

19        3.     People disagree whether the great number and continuing flow of

20  unauthorized workers into the United States has more benefits than costs.  But no one can

21  disagree that the costs and benefits accrue differently to different people in our society.  It

22  is the responsibility of our elected representatives in Congress and in our legislatures to

23  strike the balance among those competing social and economic interests.  It is the

24  responsibility of the courts to implement the balance as it has been struck, until it is struck

25  differently.  *See Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir. 1996).

26        The balance now struck is in favor of an economy for those who may work in the

27  United States.  *See Incalza v. Fendi N. Am.*, *Inc.*, 479 F.3d. 1005, 1011 (9th Cir. 2007)

28  (quoting H.R. Rep. 99-682(I), at 46, *as reprinted in* 1986 U.S.C.C.A.N. at 5650) ("In

1   passing IRCA, Congress wished to stop payments of wages to unauthorized workers,

2   which act as a 'magnet . . . attract[ing] aliens here illegally,' and to prevent those workers

3   from taking jobs that would otherwise go to citizens.").  The benefits in fact to those who

4   come to this country against the law to make better lives for themselves, to those who

5   save from lower cost labor and general depression of wages from employing unauthorized

6   aliens, and to those who enjoy the products of unauthorized labor at lower prices, do not

7   count.  The beneficiaries chosen identically by federal and Arizona law prevail over all

8   who benefit from unauthorized alien labor.

9          Suspension of the Act, whether for a month or for the years it could take to

10   conclude an appeal, would defeat the public interest as chosen by the Legislature and as

11   permitted by Congress.  If there is room for debate about the means Congress has

12   permitted to states, there is none about whether Congress and the Legislature have

13   vindicated the same substantive policies.

14          4.     Those who suffer the most from unauthorized alien labor are those whom

15   federal and Arizona law most explicitly protect.  They are the competing lawful workers,

16   many unskilled, low-wage, sometimes near or under the margin of poverty, who strain in

17   individual competition and in a wage economy depressed by the great and expanding

18   number of people who will work for less. (Facts Ex. 22I at 1.) ("[T]he U.S. Commission

19   on Immigration Reform reported . . . [that] illegal immigration, can have adverse

20   consequences by helping to depress wages for low-skilled workers and creating net fiscal

21   costs for state and local governments.").  *See also De Canas v. Bica*, 424 U.S. 351,

22   357–58 (1976) ("Employment of illegal aliens in times of high unemployment deprives

23   citizens and legally admitted aliens of jobs; acceptance by illegal aliens of jobs on

24   substandard terms as to wages and working conditions can seriously depress wage scales

25   and working conditions of citizens and legally admitted aliens; and employment of illegal

26   aliens under such conditions can diminish the effectiveness of labor unions."); *Incalza*,

27   479 F.3d at 1011.

28          If the Act is suspended, whether for a month or for years, the human cost for the

1   least among us, measured by each person's continued deprivation, multiplied by their

2   number, will be a great quantum.  Even if the injunction is lifted later, their loss will

3   never be paid back.  Against all this, Plaintiffs suffer only the expense of having their

4   computer staff log some more hours, with off-setting business benefits as well, and

5   helping authorized workers clear up their records.  This is not a sharp tipping of the

6   balance of hardships in favor of Plaintiffs.  The balance does not even tip in their

7   direction.

8           **C.    Pendency of a Jurisdictionally Sound Fresh Action Against Proper
                    Parties, Ready for a Preliminary Injunction Ruling in January, Weighs
9                   Against an Appeal Injunction in the Weeks Before Then**

10          Plaintiffs' inexplicable failure to join one or more county attorneys as defendants

11  when warned about it in September weighs heavily against a jurisdictionally infirm merits

12  injunction in this appeal.  Plaintiffs could have joined them with trivial expense and no

13  delay.  They took a profitless gamble in ignoring the need for a county attorney

14  defendant, and their urgency is of their own making.  Plaintiffs' newly filed action,

15  *Arizona Contractors II*, seeks identical relief against the proper defendants and will result

16  in an appealable preliminary injunction ruling as soon as January.  That tips the balance

17  of hardships more strongly against them on their requests for interim injunctive relief.

18  **IV.    Likelihood of Success on the Merits**

19          **A.    Jurisdictional and Justiciability Issues**

20          The court sees little prospect of success on appeal on any of Plaintiffs' alleged

21  justiciable injuries except the one injury the court found sufficient.  That ground is that

22  the operation of the Act coerces Plaintiffs to endure economic injury from use of E-

23  Verify.  (Doc. # 87 at 18–21.)  That issue has some novel aspects (*id.* at 18, 20) and is

24  based on fears grounded in credible but not certain interpretations of the Act and of

25  federal law.  It is subject to fair debate.  Plaintiffs could lose ground if the court of

26  appeals has a different understanding of that issue.

27          The court resolved only one debatable question of justiciability against Plaintiffs.

28  It held that it could provide no redress against the Attorney General, since only county

1    attorneys have the enforcement power that forces Plaintiffs to use E-Verify.  Having

2    considered Plaintiffs' further briefing on their pending motions, the court remains of the

3    view that Plaintiffs misunderstand the redressability requirement for justiciability in cost-

4    of-compliance injury cases.  They appear to think that since a declaratory judgment

5    invalidating the Act would help them, it matters little whom the declaratory judgment

6    runs against.  This expansion of coercive relief to officers in the umbras and penumbras

7    of those with the actual power that harms would take the redressability requirement into

8    fictions.  It would threaten, and perhaps step across, the Eleventh Amendment boundaries

9    on the jurisdiction of federal courts.  *See, e.g.*, *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir.

10   2001) (en banc); *Snoeck v. Brussa*, 153 F.3d 984 (9th Cir. 1997).  Giving leeway to the

11   abstractions and difficulty that attend questions of justiciability, the court still concludes

12   that it is unlikely that Plaintiffs will sustain this contention or their claim of subject matter

13   jurisdiction against these Defendants.

14        Because Plaintiffs are not likely to succeed on their jurisdictional appeal, and an

15   injunction pending appeal is not necessary to avoid loss of appellate jurisdiction, they

16   have a much heightened burden to warrant an injunction.

17        **B.        The Immigration Reform and Control Act Expressly Authorizes,
                      Rather Than Preempts, the Licensing  Sanctions in the Act**

18

19        The court also must assess Plaintiffs' likelihood of success on the merits,

20   assuming they prove jurisdiction in this appeal, for the relief they seek in these motions is

21   on the merits of their claims.  Because the court has found that the balance of hardships

22   tips strongly in favor of the Defendants, Plaintiffs bear a high burden to prove that the

23   statute is most likely invalid.  They have not shown a likelihood of success on the merits,

24   much less a strong likelihood.

25        The Supremacy Clause of the United States Constitution gives Congress the power

26   to exclude state legislation in a field as Congress defines it.  Any analysis of state

27   authority "begin[s] with the axiom that, under our federal system, the States possess

28   sovereignty concurrent with that of the Federal Government, subject only to limitations

1   imposed by the Supremacy Clause." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990).

2   Preemption analysis does not infer that "Congress ha[s] deprived the States of the power

3   to act." *Affordable Hous. Found., Inc. v. Silva*, 469 F.3d 219, 238 (2d Cir. 2006) (quoting

4   *N.Y. Tel. Co. v. N.Y. State Dep't of Labor*, 440 U.S. 519, 540 (1979)). The analysis

5   "start[s] with the assumption that the historic police powers of the States were not to be

6   superseded by the Federal Act unless that was a clear and manifest purpose of Congress."

7   *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator*

8   *Corp.*, 331 U.S. 218, 230 (1947)). The intent of Congress is the "touchstone" of any

9   preemption analysis, *Retail Clerks Int'l Ass'n v. Schermerhorn*, 375 U.S. 96, 103 (1963),

10  and there is generally a "strong presumption against finding that state law is preempted by

11  federal law," *Comm. of Dental Amalgam Mfrs. & Distribs. v. Straton*, 92 F.3d 807, 811

12  (9th Cir. 1996) (citing *Chem. Specialties Mfrs. Ass'n, Inc. v. Allenby*, 958 F.2d 941, 943

13  (9th Cir. 1992)).

14      Field preemption can be "explicitly stated in the statute's language or implicitly

15  contained in its structure and purpose." *Gade v. Nat'l Solid Waste Mgmt. Ass'n,* 505 U.S.

16  88, 98 (1992) (plurality opinion) (citations omitted). Implied field preemption exists

17  where "the scheme of federal regulation is 'so pervasive as to make reasonable the

18  inference that Congress left no room for the States to supplement it.'" *Id.* (quoting *Fid.*

19  *Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982)).

20       A state law may also be "preempted' if it conflicts with a federal law, but that

21  simply means that federal law is supreme over any contrary state law. Conflict

22  preemption is present when "compliance with both State and federal law is impossible, or

23  when the state law 'stands as an obstacle to the accomplishment and execution of the full

24  purposes and objectives of Congress.'" *Mich. Canners & Freezers Ass'n, Inc. v. Agric.*

25  *Mktg. & Bargaining Bd.*, 467 U.S. 461, 469 (1984) (quoting *Hines v. Davidowitz*, 312

26  U.S. 52, 67 (1941)). A mere difference between state and federal law is not conflict. *Fla.*

27  *Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141 (1963).

28      Before the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. §

1    1101, *et seq.*, there was no express or implied field preemption of state laws prohibiting

2    the employment of unauthorized aliens.  *De Canas v. Bica,* 424 U.S. 351 (1976).  In *De*

3    *Canas v. Bica*, a California statute prohibited employers from hiring aliens who were not

4    entitled to lawful residence in the United States if the employment would adversely affect

5    lawful resident workers.  The Supreme Court held that the state law was not preempted

6    because it did not regulate immigration or regulate in a field that the federal government

7    had occupied.  It did not decide whether the California law conflicted with any specific

8    federal law.  *Id.* at 358–64.  Like the California law, the Act does not regulate

9    immigration because it does not determine "who should or should not be admitted into the

10   country, and the conditions under which a legal entrant may remain." *Id.* at 355.  *De*

11   *Canas* sets the framework for implied preemption analysis of unauthorized alien

12   employment laws.

13                    **1.    The Plain Language of 8 U.S.C. § 1324a(h)(2) Authorizes State
                             Licensing Sanctions**

14

15        Congress left no room in IRCA for courts to infer field preemption; it expressly

16   preempted some state powers and expressly affirmed other state powers.  Section

     1324a(h)(2) of Title 8, U.S.C., provides:
17

18              The provisions of this section [8 U.S.C. § 1324a] preempt any State or local
                law imposing civil or criminal sanctions (*other than through licensing and
                similar laws*) upon those who employ, or recruit or refer for a fee for
19              employment, unauthorized aliens.

20   (Emphasis added.)  The task at hand is to give fair meaning to this express permission of

21   sanctions by "licensing and similar laws" upon "those who employ . . . unauthorized

22   aliens."  The task is not to wonder whether field preemption could be found in IRCA's

23   structure if Congress had not expressly condoned state licensing sanctions.

24        Consistent with IRCA, the Act authorizes suspension or revocation of business

25   licenses for conduct that is also prohibited by IRCA.  A.R.S. § 23-212(A) and (F).  The

26   Act falls within the plain meaning of IRCA's safe harbor for "licensing and similar laws."

27   8 U.S.C. § 1324a(h)(2).  That is enough to defeat this facial challenge.  A facial challenge

28   to a law must prove that "no set of circumstances exists under which [the law] would be

1    valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).[1]

2        The Act's definition of licenses that may be suspended or revoked comes within

3    the plain meaning of "licensing" as IRCA uses it. "License" means any state or local

4    "authorization that is required by law and that is issued . . . for the purposes of operating a

5    business in this state." A.R.S. § 23-211(7)(a). It includes articles of incorporation, a

6    certificate of partnership, a foreign corporation registration, and a transaction privilege

7    (sales) tax license, but not a professional license.[2] A.R.S. §§ 23-211(7)(b) and (c).

8    Plaintiffs' further argument that Congress could not have meant to permit the grave

9    sanction of license suspension or revocation again fights the most obvious meaning of the

10   words Congress used.

11                    **2.    The Licensing Sanction Authorization is Not Conditioned on
                             Completed Federal Proceedings Against the Violator; the**
12                           **Legislative History Does Not So State and Could Not Defeat the
                             Statutory Language if it Did**

13       Plaintiffs contend that the § 1324a(h)(2) authorization of state licensing sanctions

14   only authorizes states to enforce the federal sanctions of IRCA and, of course, states

15   cannot do that because only the Attorney General of the United States can commence

16   federal enforcement proceedings. Defendants rephrase this argument, without changing

17   its substance, as contending that states may only impose further licensing sanctions on

18   employers who already have been found liable in completed federal proceedings under

19   IRCA.

20       This interpretation would reduce the express authorization of state "licensing and

21

22   _____

23       [1] For example, only an individual adjudicated to have violated the Act could raise a
     challenge that the ancillary remedy of ordering dismissal of all unauthorized aliens exceeds
24   the safe-harbor of § 1324a(h)(2). No Plaintiff stands in that place yet. If a non-essential part
     of the Act did fall in a proper case, the rest still would stand. 2007 Ariz. Sess. Laws, ch. 279,
25   § 5 (severability clause).

26
27       [2] Whether the Act's definition of license is too broad in some particulars is an as-
     applied challenge that must await a case and a plaintiff threatened to lose what he contends
28   is not a "license" within the meaning of 8 U.S.C. § 1324a(h)(2).

1    similar laws" to nothing.  It is wholly without textual basis in the statute.  Plaintiffs base

2    their argument on a sentence in the House Judiciary Committee Report on IRCA.  H.R.

3    Rep. No. 99-682(I), at 58 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5662.  The

4    legislative history does not substantiate Plaintiffs' interpretation, but even if it did, it

5    could not change the statute or add words.  The language of the statute that Congress

6    approved, not language from the House Report concerning the statute, controls.  *Exxon*

7    *Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("[T]he authoritative

8    statement is the statutory text, not the legislative history."); *Hoffman Plastic Compounds,*

9    *Inc. v. NLRB,* 535 U.S. 137, 150 n.4 (2002) (describing House Report No. 99-682 as a

10   "single Committee Report from one House of a politically divided Congress" and noting

11   that the dissent's reliance on the report "is a rather slender reed"); *Sprietsma v. Mercury*

12   *Marine,* 537 U.S. 51, 62–63 (2002) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S.

13   658, 664 (1993)) (asserting that express preemption analysis focuses on the plain wording

14   of the statute, "which necessarily contains the best evidence of Congress' pre-emptive

15   intent.").  Based on the plain statutory language, no prior federal enforcement action is

16   necessary before a state may impose sanctions against an employer's license, and the field

17   preemption inquiry ends there.

18        In any event, the legislative history, and the House Report in particular, do not

19   compel the meaning Plaintiffs urge.  After the *De Canas* decision, Congressional bills

20   calling for federal employer sanctions began to contain preemption clauses for the first

21   time.  *See, e.g.*, S. 2252, 95th Cong. § 5 (1976); H.R. 9531, 95th Cong. § 5 (1976).  None

22   passed.

23        The March 1, 1981 final report and recommendation of the Select Commission on

24   Immigration and Refugee Policy recommended that any attempt at immigration reform

25   provide sanctions for employers who knowingly hire undocumented immigrants, but the

26   report did not recommend federal preemption of complementary state laws.  In following

27   sessions of Congress, bills were introduced based on the recommendations of the Select

28   Commission, but they included preemption clauses similar to that in the bills from the

1   95th Congress.  *See* S. 1765, 97th Cong. (1981); H.R. 4832, 97th Cong. (1981); S. 2222,

2   97th Cong. (1982); H.R. 5872, 97th Cong. (1982); S. 529, 98th Cong. (1983); H.R. 1510,

3   98th Cong. (1983).  Again, none passed.

4          In the 99th Congress, S. 1200 and H.R. 3810 contained preemption clauses that for

5   the first time included the exception "other than through licensing and similar laws."

6   Unlike the earlier bills, S. 1200 was enacted and became the Immigration Reform and

7   Control Act of 1986.  The Senate Judiciary Committee Report dated August 25, 1985, did

8   not comment on the express authorization of state licensing and similar laws, and the

9   Senate passed the bill on September 19, 1985.  *See* S. Rep. No. 99-132 (1985).  One of

10  four House Committee Reports, however, the House Judiciary Committee Report dated

11  July 16, 1986, did comment on the licensing exception to preemption:

12              The penalties contained in this legislation are intended to specifically
            preempt any state or local laws providing civil fines and/or criminal sanctions on
13          the hiring, recruitment or referral of undocumented aliens.

14              They are not intended to preempt or prevent lawful state or local processes
            concerning the suspension, revocation or refusal to reissue a license to any person
15          who has been found to have violated the sanctions provisions in this legislation.
            Further, the Committee does not intend to preempt licensing or "fitness to do
16          business laws," such as state farm labor contractor laws or forestry laws, which
            specifically require such licensee or contractor to refrain from hiring, recruiting or
17          referring undocumented aliens.

18  H.R. Rep. No. 99-682(I), at 58 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5662

19  ("House Report").  The conference committee report said nothing about preemption.  *See*

20  H. Conf. Rep. No. 99-1000 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5840.  Therefore,

21  whatever the meaning of the House Judiciary Committee Report's comment, it was not

22  before the Senate when it approved the bill.

23          The House Report also does not support Plaintiffs' argument.  Their interpretation

24  overlooks the first quoted sentence, which paraphrases the bill as preempting only state

25  "fines" and "criminal sanctions."  The Arizona Act imposes no fines or criminal

26  sanctions.  Plaintiffs rely on the second quoted sentence, which no doubt correctly states

27  that state licensing processes are not preempted as to "any person who has been found to

28  have violated the sanctions provisions of this legislation."  But Plaintiffs go further and

1    assert that the example given in that sentence exhausts the entire meaning of the licensing

2    sanction authorization.  The passage does not so state, and the very next sentence gives

3    further examples of permitted licensing sanction laws that are not tied to completed

4    federal violation proceedings.  Though one could look for further light in the legislative

5    history (Plaintiffs acknowledged that they did not review the floor debates), one need

6    look only to the sentence after the one Plaintiffs rely upon to see that the House Report

7    does not bear the meaning they would give it.

8        Finally, if the House Report did mean what Plaintiffs contend, such an attempt to

9    override the plain language of the statute would be precisely the kind of excess that the

10   modern view of legislative history illegitimates.  The Members or their staff must write

11   amendments into the bill, not into the Report.

12       **C.    The Act Does Not Conflict With IRCA**

13       As noted above, conflict preemption exists when "compliance with both State and

14   federal law is impossible, or when the state law 'stands as an obstacle to the

15   accomplishment and execution of the full purposes and objectives of Congress.'" *Mich.*

16   *Canners & Freezers Ass'n Inc. v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 469

17   (1984).  A mere difference between state and federal law is not conflict.  *Fla. Lime &*

18   *Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141 (1963).  Conflict preemption is not

19   implied absent an "actual conflict." *English v. Gen. Elec. Co.*, 496 U.S. 72, 90 (1990)

20   (citation omitted).  "Tension between federal and state law is not enough to establish

21   conflict preemption."  *Incalza v. Fendi N. Am., Inc.*, 479 F.3d. 1005, 1009 (9th Cir. 2007)

22   (citing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 256 (1984)).  In addition, "[w]here

23   state enforcement activities do not impair federal regulatory interests concurrent

24   enforcement activity is authorized."  *Gonzales v. City of Peoria*, 722 F.2d 468, 474 (9th

25   Cir. 1983) (citing *Fla. Avocado Growers*, 373 U.S. at 142), *overruled on other grounds*

26   *by Hodgers-Durgin v. de la Vina*, 199 F.3d. 1037 (9th Cir. 1999).

27       In passing the federal laws that prohibit the employment of unauthorized aliens,

28   "Congress wished to stop payments of wages to unauthorized workers, which act as a

1  magnet . . . attract[ing] aliens here illegally, and to prevent those workers from taking jobs

2  that would otherwise go to citizens." *Incalza*, 479 F.3d at 1011 (internal quotation marks

3  omitted) (holding that IRCA did not preempt California employment law).  Likewise, the

4  Act aims to sanction the licenses of knowing employers of unauthorized aliens within the

5  express permission of 8 U.S.C. § 1324a(h)(2), and it does so without conflicting with

6  other federal laws.

7  Plaintiffs assert that Congress carefully selected the prohibitions, penalties,

8  procedures, and protections that properly balanced the competing policy objectives

9  surrounding passage of IRCA, and that any departure from those exact parameters by the

10  State necessarily stands as an obstacle to Congress' full objectives.  The argument that

11  Congress created an "integrated scheme," any departure from which necessarily poses a

12  conflict, is an argument for implied field preemption. *See, e.g.*, *Wisconsin Dept. of Indus.,*

13  *Labor and Human Relations v. Gould*, 475 U.S. 282, 288 (1986).  As the court has

14  explained, the fact that Congress expressly allowed states to impose licensing sanctions

15  forecloses the argument that it impliedly occupied the same field.  Since Plaintiffs'

16  proposed "conflicts" are all based on differences between the State and federal

17  procedures, not incompatibilities, those contentions are merely reworded arguments for

18  field preemption.

19  For example, Plaintiffs complain that the licensing penalties in the Act are more

20  severe than the penalties in the federal law.  That argument ignores Congress' express

21  approval of such state licensing penalties in 8 U.S.C. § 1324a(h)(2).  Similarly, they note

22  that the Act's definition of "employee" does not match exactly the federal definition.  As

23  a matter of statutory construction, it is improbable that the Act's definition requires

24  verification of persons who are exempted from IRCA such as casual hires and

25  independent contractors.  An "employment relationship" is required.  A.R.S. § 23-211(3).

26  Regardless, such a contention would at most narrow the Act and must be raised in an as-

27  applied challenge by such an employer rather than in this facial challenge.  Nor does any

28  Plaintiff show it has the types of workers necessary to raise this challenge.

1      The Act does use a different adjudicatory process than IRCA, but conflict

2  preemption does not arise merely because state laws do not replicate federal laws and

3  procedures.  The State's law probably would be invalid if it attempted to invoke IRCA's

4  hearing process for its own purposes, or if it attempted to make its own determination of

5  immigration status to affect a person's admissibility or deportability from the United

6  States.  *See* 8 U.S.C. §§ 1229a(a)(1), 1229a(a)(3).  Instead, the Act determines an

7  employee's eligibility to work in the United States for the purpose of imposing licensing

8  sanctions on an employer.

9      Such a determination does not decide "who should or should not be admitted into

10  the country," so it does not conflict with the federal government's regulation of

11  immigration.  *De Canas*, 424 U.S. at 355.  Nor is the State's procedure likely to conflict

12  with IRCA's procedure, because the State makes its determination in the exercise of the

13  power that Congress expressly left to it under 8 U.S.C. § 1324a(h)(2).  *See Garrett v. City*

14  *of Escondido*, 465 F. Supp. 2d 1043, 1057 (S.D. Cal. 2006) (noting that states may make

15  a formal determination of an individual's alienage status for purposes authorized by

16  federal statute); House Report at 66–68, 1986 U.S.C.C.A.N. at 5670–72 (discussing the

17  states' responsibility to "verify whether alien applicants for certain public assistance

18  programs are in a lawful immigration status and thus eligible for participation").  States

19  must often determine an individual's immigration status to administer state laws that do

20  not conflict with federal laws.  *See, e.g.*, A.R.S. § 36-2933 (eligibility for State health care

21  services); § 46-292 (eligibility for cash assistance); § 28-3153(D) (eligibility for a drivers'

22  license); Ariz. Const. art. II, § 22.A.4 (eligibility for bail); *Hernandez v. Lynch*, 167 P.3d

23  1264 (Ariz. Ct. App. 2007) (eligibility for bail).

24      Importantly, the State defers to the federal government's response to a lawful

25  request under 8 U.S.C. § 1373(c) to make this determination.  It then ostensibly allows

26  the employer the opportunity to present evidence to rebut the federal government's

27  determination.  *See* A.R.S. § 23-212(H) (according the federal government's

28  determination only a rebuttable presumption of accuracy); Ariz. R. Civ. P. 65.2 (requiring

1    an evidentiary hearing before sanctions may be imposed unless all parties waive the

2    hearing).   This is harmonization with federal law, not conflict.  The mere fact that the

3    parallel procedures could result in an employer being found in violation of the Act but not

4    IRCA does not establish conflict preemption.  That is simply the result of the concurrent

5    enforcement activity in our federal system where Congress has specifically preserved

6    state authority.

7         When enacting IRCA, Congress sought to minimize undue burdens on employers.

8    The Act does not make employers conform to a stricter standard of conduct than the

9    federal law.  Liability under both IRCA and the Arizona Act requires that, at a minimum,

10   the employer "knowingly" employ an unauthorized alien.  8 U.S.C. § 1324a(a)(1)(A);

11   A.R.S. § 23-212(A).  Both statutes include procedures for weeding out frivolous

12   complaints, and under both statutes the enforcement official has ultimate discretion to

13   decide whether to bring an enforcement action in any given case.  8 U.S.C. § 1324a(e);

14   A.R.S. § 23-212(C).

15        Congress and the State of Arizona have enacted anti-discrimination laws.

16   Plaintiffs contend that Arizona's reliance on those laws, rather than placing duplicate

17   provisions within the Act, conflicts with the federal policy of minimizing discrimination.

18   The Supremacy Clause is not that weak.  Arizonans remain protected by the prohibitions

19   against such discrimination in IRCA itself.  *See* 8 U.S.C. § 1324b (defining and

20   prohibiting unfair immigration-related employment practices).  Those protections

21   somewhat overlap the employment discrimination prohibitions found in federal and

22   Arizona law generally.  42 U.S.C. § 2000e-2 (prohibiting discrimination based on "race,

23   color, religion, sex, or national origin"); A.R.S. § 41-1463(B) (prohibiting employment

24   discrimination based on "race, color, religion, sex, age, disability or national origin").

25   Moreover, the Act provides that it "shall not be construed to require an employer to take

26   any action that the employer believes in good faith would violate federal or state law."

27   A.R.S. § 23-213.  There is no conflict with the federal goal of discouraging discrimination

28   because the Act does not authorize, encourage, or even allow discrimination; nor does it

1   deprive any worker of the express federal protections.

2       In sum, Plaintiffs have little chance of prevailing on their conflict preemption

3   argument.  They simply note differences between IRCA and the Arizona Act.

4   Differences are bound to arise where Congress has left it to the states to regulate a given

5   area concurrently with the federal government.

6       **D.   Required Participation in E-Verify as Part of a State Licensing
           Sanction Program Permitted by 8 U.S.C. § 1324a(h)(2) is Not in
7          Conflict With or Pre-Empted by Federal Law**

8       Because use of E-Verify is voluntary under federal law, Plaintiffs assert that the

9   State's requirement that all employers check the employment eligibility of new hires

10  through E-Verify is invalid under implied field preemption and conflict preemption.

11  Neither the Illegal Immigration Reform and Immigrant Responsibility Act of 1996

12  ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-655 (Sept. 30, 1996), nor the Basic Pilot

13  Program Extension and Expansion Act of 2003 ("Expansion Act"), Pub. L. No. 108-156,

14  117 Stat. 1944 (Dec. 3, 2003), requires such a conclusion.

15      Congress' purpose for creating E-Verify was to experiment with a system to

16  improve employers' ability to verify the work authorization of new hires beyond the I-9

17  system.  The program was in an evaluative stage when it was created, and so Congress

18  was leery of mandating its use right away itself.  Accordingly, it prohibited the Attorney

19  General from requiring participation in the program.  IIRIRA § 402(a), 110 Stat.

20  3009-656.  But that does not necessarily mean that Congress placed the conduct that it

21  excluded from federal mandate — whether to use E-Verify — also outside of the

22  residuum of conduct subject to the police power of the state.  A decision not to invoke

23  federal coercive powers leaves conduct within the power of the states to compel or forbid

24  for proper legislative purposes.

25      Unlike the regulation in *Geier v. Am. Honda Motor Co.*, 529 U.S. 861 (2000),

26  nothing in the statutory text or history suggests that Congress intended to vest employers

27  with an individual right, good against the states' police power, to choose whether or not

28  to participate in E-Verify.  The federal statute in *Geier* sought to create a marketplace of

1    individual choices from which better mixes of automobile safety and economy could

2    emerge.  *Id.* at 874–75.  When a California law mandated one choice, it defeated the

3    federally preferred marketplace.  In contrast, federal policy encourages the utmost use of

4    E-Verify, not individual autonomy for the sake of some higher federal goal.

5         Congress did not cap participation levels.  It allowed all employers in the

6    authorized states to use the program.  Later, the Expansion Act opened participation to

7    employers in all fifty states.  The federal government undertook advertising campaigns to

8    increase participation levels and utilize the excess capacity available. (Facts Ex. 11 at 10.)

9    Notably, no party has submitted evidence that the federal government officers who

10   administer E-Verify view the state requirement as an obstruction.  To the contrary, the

11   current administration and the DHS Secretary have endorsed making E-Verify mandatory

12   for all employers nationally. (Facts Ex. 15 at 8.)  All of this proves that the federal

13   government encourages increased participation in E-Verify; it does not support an

14   inference that federal policy leaves no room for the states to supplement federal

15   requirements by mandating that employers use E-Verify.  Plaintiffs' failure to present

16   evidence from federal officers that the required Arizona participation in E-Verify is

17   unwelcome is highly damaging to their case.

18        Arizona's requirement will increase the volume of registered employers and the

19   number of inquiries processed through E-Verify.  But Congress encourages state and

20   federal authorities to communicate regarding immigration status.  *See* 8 U.S.C. § 1373(a);

21   8 U.S.C. § 1644.  Requiring Arizona employers to check employment eligibility through

22   E-Verify does not abuse the system for a purpose that Congress did not intend.  E-Verify

23   was created for precisely that purpose.  Furthermore, Arizona's use of E-Verify is for a

24   licensing sanctions program authorized by Congress in section 1324a(h)(2) of IRCA.

25   Therefore, *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043, 1057 (S.D. Cal. 2006),

26   which found a conflict where the federal government was burdened by an inappropriate

27   use of its program, does not apply.  The fact that the Act will result in additional inquiries

28   to the federal government is consistent with federal law.

1    The federal government, of course, retains the ability to terminate an employer's

2  use of E-Verify or to discontinue the E-Verify program entirely.  Despite Plaintiffs'

3  concerns that such an occurrence would force employers into non-compliance with State

4  law, there is no reason to think that the government would exclude users except for their

5  own misconduct.  If E-Verify ceases to exist, there will be time enough to deal with that

6  currently imaginary case.

7    Arizona's decision to require employers to use E-Verify is an attempt to coordinate

8  State efforts to reduce the hiring of unauthorized aliens through licensing sanctions with a

9  federal government program that has the same goal.  It does not stand as an obstacle, but

10  rather an aid to achieving the federal government's purposes and objectives in a realm

11  explicitly left open to the states.

12    **E.    Procedural Due Process**

13    **1.    Preclusion of the Employer's Evidence Concerning Whether the
           Employee Is Authorized Would Raise a Serious Question of**
14    **Procedural Due Process**

15    Under both the federal and State constitutions, procedural due process requires that

16  a party have an opportunity to be heard "at a meaningful time and in a meaningful

17  manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*,

18  380 U.S. 545, 552 (1965)). Due process requires notice that is reasonably calculated

19  under all of the circumstances to apprise interested parties of the pendency of the action

20  and afford them the opportunity to present their objections.  *Mullane v. Cent. Hanover*

21  *Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  It also requires "a fair trial in a fair

22  tribunal." *In re Murchison*, 349 U.S. 133, 136 (1955); *United States v. Superior Court*,

23  144 Ariz. 265, 280, 697 P.2d 658, 673 (1985).  Due process "is flexible and calls for such

24  procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334

25  (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).

26    The Act raises a serious question of procedural fairness to employers charged with

27  knowingly or intentionally employing an unauthorized alien.  It provides the following

28  concerning Superior Court proceedings under the Act:

> On determining whether an employee is an unauthorized alien, the court shall consider only the federal government's determination pursuant to 8 United States Code section 1373(c).  The federal government's determination creates a rebuttable presumption of the employee's lawful status.  The court may take judicial notice of the federal government's determination and may request the federal government to provide automated or testimonial verification pursuant to 8 United States Code section 1373(c).

A.R.S. § 21-212(H).  This subsection is somewhat at war with itself.  On the one hand, the Superior court "shall consider only" the federal government's determination.  But on the other hand, that determination only creates "a rebuttable presumption," meaning that other evidence may be considered.

Unless there has already been an opportunity for fair and adequate determination of the employee's work authorization, the Superior Court proceeding must supply that fair and adequate procedure.  A procedure that bars all evidence from the employer on an essential element plainly would fall short of due process of law.  If this were the case, Plaintiffs would have made a very substantial showing that the Act's procedure is probably unconstitutional.

However, that is probably not the meaning of subsection (H).  It parallels subsection (B), which prohibits enforcing officers from "independently making a final determination on whether an alien is authorized to work in the United States" apart from the government's § 1373(c) response.  Subsections (B) and (H) are meant to protect workers from being the direct subject of investigation and enforcement under the Act.  But where the employer is on trial, the § 1373(c) determination creates only a rebuttable presumption — meaning that the employer may present any evidence to prove the employee's lawful status and the employer's lack of knowledge.  It is only the State that is prohibited from investigating workers directly and from offering extrinsic evidence of their status.

This reconciliation of these difficult statutory passages has the virtues of making sense, being fair to the employer, and avoiding unconstitutionality.  *See Mejak v. Granville*, 212 Ariz. 555, 557, 136 P.3d 874, 876 (2006) ("[I]n interpreting a statute, this

1  Court must . . . give effect to every provision in the statute . . . [and] interpret the statute

2  so that no provision is rendered meaningless, insignificant, or void."); *Business Realty v.*

3  *Maricopa County*, 181 Ariz. 551, 559, 892 P.2d 1340, 1349 (1995) ("We interpret

4  statutes to uphold their constitutionality, if that is possible.  As a corollary, we strive to

5  give statutes meanings that avoid serious constitutional issues. We reach those only when

6  absolutely necessary.").  Defendants point out that because the Superior Court must

7  adjudicate whether the employer "knowingly" or "intentionally" employed an

8  unauthorized alien, "a judge will consider arguments and evidence that go to essential

9  elements of the Act."  (Doc. # 58 at 22 and n. 17.)  Since that includes considering all the

10  employer's evidence on whether the employee was an unauthorized alien, not just the

11  government's § 1373(c) response, procedural due process will likely be afforded to

12  employers.  *See* Ariz. R. Civ. P. 65.2 (requiring an evidentiary hearing before sanctions

13  under the Act may be imposed unless all parties waive the hearing).

14      Plaintiffs also argue that under § 1373(c) the government does not make a

15  "determination" of the employee's "lawful status" to work.  The government's response

16  gives "the citizenship or immigration status" of a person.  8 U.S.C. § 1373(c).  It is not

17  clear that a response failing to confirm an employee's "lawful status" is a "determination"

18  that the employee lacks lawful status.  In some circumstances, it may be that the

19  government's response of non-confirmation means little in its own right.  However, if the

20  government's response fails to give enough information to determine an employee's work

21  authorization, the State's case fails.  It does not mean that the employer is sanctioned

22  anyway.  These questions are not adequately explored in this record.

23      Furthermore, Plaintiffs have not shown that the government's response under 8

24  U.S.C. § 1373(c) will exclude an interactive process like that employed in E-Verify.  That

25  process is fair, prompt, adequate, and provides opportunity to be heard.  (Facts, Ex. 13,

26  App. C at C-2.)  Errors in the government's database concerning authorized workers can

27  be corrected.  This record does not show what the government does or would do if the

28  State or the Superior Court requests such interactive and error-correcting processes under

1   § 1373(c).  Plaintiffs fall short of proving that "no set of circumstances exists under which

2   [the Act] would be valid." *United States v. Salerno,* 481 U.S. 739, 745 (1987).  Perhaps

3   this shortfall can be made up in the second case, *Arizona Contractors II.*

4        Moreover, the issue is not ripe, as it could arise only in a Superior Court

5   enforcement proceeding, which no Plaintiff faces and which could not happen before

6   preliminary injunctive relief will be considered in *Arizona Contractors II* in January.

7   Finally, if § 23-212(H) does unconstitutionally bar an employer from offering evidence, it

8   would be voided and severed, leaving the rest of the Act standing.

9        Though Plaintiffs have raised a substantial issue, they have not met their burden of

10   showing a strong likelihood of success on this issue.

11               **2.       The Superior Court Process Is Fair and Adequate**

12        Plaintiffs' other procedural due process challenges have no merit.  The other

13   Superior Court processes are subject to all the procedural protections of the Arizona

14   Rules of Civil Procedure.  Since the Superior Court has full evidence-taking, fact-finding,

15   and discretionary authority on these issues, with the burden of proof on the State, there

16   can be no due process right to participate in the enforcing officer's investigation and

17   preparation of his case (though civil enforcement proceedings are rarely brought without

18   first contacting the defendant).

19        The Act nowhere says that county attorneys must prosecute all non-frivolous

20   cases, or ones motivated by discrimination.  Plaintiffs' other procedural fears are

21   improbable.  If they ever arose in a real case, they could be decided, but there are no real

22   facts here and the Act is not deficient on its face.

23               **F.       Other Contentions**

24        The Plaintiffs in No. CV 07-1355 raise other contentions that call only for brief

25   comment.

26        The Act does not purport to reach the out-of-state employees of Arizona

27   employers; therefore it does not implicate the Commerce Clause.  The county attorney

28   can bring an enforcement action only "in the county where the unauthorized employee is

employed." A.R.S. § 23-212(D).

Plaintiffs have no substantive due process right to employ unauthorized aliens or to refuse lawful precautions against doing so. This is not a separate argument but a restatement of the federal preemption and procedural due process contentions.

The Act does not violate the separation of powers principle of Art. III of the Arizona Constitution and does not have the improbable meanings Plaintiffs would give it to implicate that principle.

**V. Conclusion**

For the foregoing reasons, Plaintiffs have failed to make a sufficient showing for an injunction pending appeal.

IT IS THEREFORE ORDERED that the motions for injunction pending appeal (Doc. ## 91 and 94) are denied.

DATED this 21st day of December 2007.

_____
Neil V. Wake
United States District Judge

1

**INDEX**

2

I.      Nature of the Motion and Related Proceedings  . . . . . . . . . . . . . . . . . . . . . . . . . 2

3

II.     Standards for Injunction Pending an Appeal  . . . . . . . . . . . . . . . . . . . . . . . . . 4

4

III.    Plaintiffs Have Little Hardship from Participating in E-Verify, and the
5       Balance of Hardships is Strongly Against an Injunction Pending Appeal  . . . . . . 6

6               A.      Plaintiffs' Hardship is Minimal  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

7               B.      An Injunction Will Gravely Injure the Interests of the State, the
                        Interests of Others, and the Public Interest  . . . . . . . . . . . . . . . . . . . . . . . 8
8
                C.      Pendency of a Jurisdictionally Sound Fresh Action Against Proper
9                       Parties, Ready for a Preliminary Injunction Ruling in January, Weighs
                        Against an Appeal Injunction in the Weeks Before Then  . . . . . . . . . . . 11
10
IV.     Likelihood of Success on the Merits  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
11
                A.      Jurisdictional and Justiciability Issues  . . . . . . . . . . . . . . . . . . . . . . . . . 11
12
                B.      The Immigration Reform and Control Act Expressly Authorizes,
13                      Rather Than Preempts, the Licensing  Sanctions in the Act  . . . . . . . . . . 12

14                              1.      The Plain Language of 8 U.S.C. § 1324a(h)(2) Authorizes
                                        State Licensing Sanctions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
15
                                2.      The Licensing Sanction Authorization is Not Conditioned
16                                      on Completed Federal Proceedings Against the Violator;
                                        the Legislative History Does Not So State and Could Not
17                                      Defeat the Statutory Language if it Did  . . . . . . . . . . . . . . . . . . . . . 15

18              C.      The Act Does Not Conflict With IRCA  . . . . . . . . . . . . . . . . . . . . . . . . . 18

19              D.      Required Participation in E-Verify as Part of a State Licensing
                        Sanction Program Permitted by 8 U.S.C. § 1324a(h)(2) is Not in
20                      Conflict With or Pre-Empted by Federal Law  . . . . . . . . . . . . . . . . . . . . 22

21              E.      Procedural Due Process  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

22                              1.      Preclusion of the Employer's Evidence Concerning
                                        Whether the Employee Is Authorized Would Raise a Serious
23                                      Question of Procedural Due Process  . . . . . . . . . . . . . . . . . . . . . . 24

24                              2.      The Superior Court Process Is Fair and Adequate  . . . . . . . . . . . 27

25              F.      Other Contentions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

26      V.      Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

27

28